**John A. ADAMS and Joyce E. Adams, et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**No. 96–699C.**

United States Court of Federal Claims,

Oct. 30, 1998.

Jeff H. Eckland, Faegre & Benson, L.L.P., Minneapolis, MN, attorney of record for plaintiffs. William L. Roberts, Faegre & Benson, L.L.P., Minneapolis, MN, of counsel.

Mark L. Josephs, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, with whom were David M. Cohen, Director, and Frank W. Hunger, Assistant Attorney General, attorneys of record for the defendant. Phillip L. Southers, Office of General Counsel, Community Development Division, Department of Agriculture, Washington, DC, of counsel.

## OPINION

HORN, Judge.

### I. FACTS

One hundred and four (104) plaintiffs in this civil action own rental housing projects located in rural areas across the United States. Each plaintiff entered into at least one contract with the Farmers Home Administration, United States Department of Agriculture ("FmHA"), prior to December 15, 1989, for a loan to provide low- and moderate-income rural rental housing. These loan agreements were made pursuant to section 515 of the Housing Act of 1949, Pub.L. No. 87–723, § 4(b), 76 Stat. 671 (1962) (codified as amended at 42 U.S.C. § 1485 (1994)). Section 515 authorized the FmHA, an agency of the defendant, to make or insure loans to property owners to provide low- and moderate-income rental housing for elderly residents in rural areas across the United States ("the section 515 program"). 42 U.S.C. § 1485. In 1966, the section 515 program was expanded to serve the housing needs of non-elderly individuals. Pub.L. No. 89–754, § 804, 80 Stat. 1255, 1282 (1966).

Under the section 515 program, an owner's contract is documented by, *inter alia*, a promissory note, a loan agreement, and a real estate mortgage. The promissory note and real estate mortgage are expressly referenced in the loan agreement.

In FmHA's contracts with section 515 program property owners, FmHA agreed to make or insure loans to finance the construction of rural rental housing units. Owners, in return, agreed in their contracts to numer-

ous restrictions on the use of their properties while their loans remained outstanding, including: (i) to accept only low- or moderate-income persons as tenants; (ii) to charge no higher rents than those permitted by FmHA; (iii) to restrict their investment returns to a rate of eight percent of their initial capital contributions; and (iv) to maintain certain cash reserves ("the investment return restrictions"). The FmHA also included the following two express provisions in the promissory notes executed by borrowers/owners in the section 515 program: (i) "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower"; and (ii) "[t]his note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof."

The loan agreements, by their terms, continue only as long as the indebtedness under the promissory notes remains unsatisfied. FmHA also included the following provision in the loan agreements executed by the borrowers/owners in the section 515 program: "[i]t is understood and agreed by the Borrower that any loan made or insured will be administered subject to the limitations of the authorizing act of Congress and related regulations...."

## II. LEGISLATION

### A. 1962 Section 515 Program Legislation

Pursuant to the section 515 program, Congress authorized FmHA to enter into contractual agreements with owners to provide housing units to low- and moderate-income and elderly tenants in rural areas. Congress began this program in 1962 by adding section 515 to the Housing Act of 1949, Pub.L. No. 87–723, § 4(b), 76 Stat. 671 (1962). Congress specifically conferred on FmHA discretion to determine the terms of repayment of section 515 loans. 42 U.S.C. § 1472(b)(2). Pursuant to the discretion conferred on it by Congress, FmHA granted each owner, in the promissory note signed by the parties, the right to prepay their loans at any time at their option. FmHA included the following express provision in the promissory notes executed by each borrower/owner: "[p]repayments of

scheduled installments, or any portion thereof, may be made at any time at the option of Borrower."

### B. 1979 Legislation

In 1979, Congress enacted legislation restricting FmHA's ability to accept prepayments from owners exercising their termination option. Housing and Community Development Amendments of 1979, Pub.L. No. 96–153, tit. V, § 503, 93 Stat. 1134 (1979) (codified as amended at 42 U.S.C. § 1472 ("the 1979 legislation")). This statute prohibited prepayment unless an owner agreed to the imposition of a restrictive-use covenant extending the investment return limitations on the owner's property for a period of 15 or 20 years from the loan origination date. Id.

### C. 1980 Legislation

In 1980, Congress restored the prepayment option for all owners who owned their property prior to December 21, 1979 ("the pre-1979 owners"). Housing and Community Development Act of 1980, Pub.L. No. 96–399, tit. V, § 514, 94 Stat. 1671 (1980) (codified as amended at 42 U.S.C. § 1472 (1994) ("the 1980 legislation")). However, the 1980 legislation prohibited FmHA from negotiating a prepayment option with any future owner unless the housing was subjected to a restrictive-use covenant. Owners entering into contracts on or after December 21, 1979 ("the post-1979 owners") had to accept restrictive-use provisions requiring their housing units to continue operating as low-income housing for a minimum of 15 or 20 years from the date of loan origination ("the post-1979 option"). Thus, following enactment of the 1980 legislation, pre-December 21, 1979 owners regained their unrestricted termination option ("the pre-1979 option") and post-1979 owners obtained a restricted post-1979 option.

### D. 1988 Legislation

In response to increasing numbers of section 515 housing owners submitting prepayment applications, H.R.Rep. No. 100–122(I), 100th Cong., 1st Sess. 1, 53 (1987), reprinted in 1987 U.S.C.C.A.N. 3317, 3369, in 1988,

Congress enacted the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA"). Title II of the Housing and Community Development Act of 1987, Pub L. No. 100–242, 101 Stat. 1877 (1988) (codified as amended at 42 U.S.C. § 1472(c) (1994) and 12 U.S.C. § 1715*l* note (1994) ("the 1988 legislation")). The 1988 legislation placed "those owners of projects placed in service prior to 1979 on the same playing field as those post–1979 projects who are required by law to keep their units low-income for 20 years." H.R.Rep. No. 100–122(I) at 55, *reprinted in* 1987 U.S.C.C.A.N. at 3371. The 1988 legislation accomplished this in several stages. First, it required owners entering into contracts before December 21, 1979 to negotiate an agreement with FmHA to extend the low-income use of their properties for a period of 20 years from the date of agreement. The 1988 legislation § 241 (codified as amended at 42 U.S.C. § 1472(c)(4)(A)).

Second, pre-1979 owners who did not agree to a 20-year extension period subjected their properties to forced sales to non-profit organizations and public agencies. In effect, any pre-1979 owner's intent to exercise the termination option was immediately subjected to a six-month period during which non-profit organizations or public agencies enjoyed a right of first refusal to purchase the owner's property ("the six-month forced-sale proceeding"). The 1988 legislation § 1472(c)(5)(A).

*E. 1992 Legislation*

On October 28, 1992, Congress enacted the Housing and Community Development Act of 1992, Pub.L. No. 102–550, § 2 & tit. VII § 712, 106 Stat. 3681, 3841 (1992) (codified in relevant part at 42 U.S.C. § 1472(c) ("the 1992 legislation")). The 1992 legislation applied to all section 515 owners and established uniform restrictions on any right to prepay.

First, the 1992 legislation prohibits FmHA from accepting any prepayment unless it makes reasonable efforts to enter into an agreement with the owner to extend low-income use of its housing units for not less that the 20-year period beginning on the date on which the agreement is executed ("the 20-year extension agreement"). 42 U.S.C. § 1472(c)(4)(A). In order to induce owners to extend the low-income use of their housing units, the 1992 legislation authorized FmHA to offer limited, specified "incentives" to owners, including such things as rental assistance and equity loans. 42 U.S.C. § 1472(c)(4)(B); the 1992 legislation § 712.

Second, the 1992 legislation requires owners who are unwilling to surrender their negotiated termination option and participate for another 20 years to offer to sell their properties to any qualified nonprofit organization or public agency at a fair market value ("the forced-sale proceeding"). 42 U.S.C. § 1472(c)(5)(A).

Third, the 1992 legislation provides a possible exception for owners enabling them to avoid extending their section 515 participation for 20 years without subjecting themselves to a six-month forced sale proceeding. The exception arises if:

> the Secretary can determine that the housing opportunities of minorities will not be materially affected as a result of the prepayment or refinancing, and that—
>
> > (I) the borrower (and any successor in interest thereof) are obligated to ensure that tenants of the housing and related facilities financed with the loan will not be displaced due to a change in the use of the housing, or to an increase in rental or other charges, as a result of the prepayment or refinancing; or
> >
> > (II) there is an adequate supply of safe, decent, and affordable rental housing within the market area of the housing and related facilities and sufficient actions have been taken to ensure that the rental housing will be made available to each tenant upon displacement.

42 U.S.C. § 1472(c)(5)(G)(ii).

### III. PROCEDURAL HISTORY

Plaintiffs brought this action on October 31, 1996 and filed an amended complaint on November 27, 1996 on two counts: breach of contract and Fifth Amendment taking. First, plaintiffs claim that defendant's 1992 legislation anticipatorily repudiated the con-

tracts between the defendant and each of the plaintiffs, in that the 1992 legislation terminated the pre-1979 loanholder's prepayment option. According to the plaintiffs, this anticipatory repudiation has deprived each plaintiff of its contractual right to terminate its contract at any time, at its option, before the expiration date of its contract term. Plaintiffs contend that "[t]he Government's anticipatory repudiation constitutes a breach of each plaintiff's contract as of the date of Government's performance required by each contract, i.e., the date that each plaintiff would terminate its contract but for the Government's repudiation."

Second, plaintiffs claim that defendant's conduct constitutes a taking of plaintiffs' properties for public use and should require payment to plaintiffs of just compensation under the Fifth Amendment to the United States Constitution. According to the plaintiffs, such takings occur "as of the date of Government performance required by each contract entered into between the defendant and the plaintiffs."

In defendant's motion to dismiss, defendant claims that the statute of limitations has expired for certain of the plaintiffs. Defendant claims that ELIHPA provided rules that prevent pre-1979 loanholders from exercising their prepayment options. Defendant further claims that the above-captioned case, filed October 31, 1996, was filed more than six years after the enactment of ELIHPA on February 5, 1988. Consequently, the defendant argues that the statute of limitations bars plaintiffs' breach of contract claims relating to loans entered into, or those which should be treated as entered into, before December 21, 1979, and that, therefore, these claims should be dismissed.

The plaintiffs' First Amended Complaint, filed November 27, 1996, included 83 plaintiffs. On March 20, 1997, plaintiffs filed notice of 21 additional plaintiffs. Defendant seeks the dismissal of the breach of contract claims of plaintiffs who hold only pre-1979

loans, as well as the breach of contract claims relating to the pre-1979 loans of those plaintiffs who hold both pre- and post-1979 loans. With respect to plaintiffs who exercised assumptions or modifications after 1979 of loans that were originally executed pre–1979, defendant claims that they should be dismissed except for the following category: those plaintiffs who hold assumption agreements between 1982 and 1987 that contain post-1979 restrictive prepayment language. Defendant agrees that these plaintiffs are subject to post-1979 prepayment provisions and should be treated the same as post-1979 loanholders for the purposes of the motion to dismiss.

Plaintiffs filed a Motion for Partial Summary Judgment and Opposition to Defendant's Motion to Dismiss Certain Claims. In their Motion For Partial Summary Judgment,[1] plaintiffs claim that the government's inability, by reason of the 1992 legislation, to perform its contractual undertaking makes the government liable for breach of contract damages. Plaintiffs contend that each owner's right to prepay its loan at any time at the owner's option is a material term in each plaintiff's contract with FmHA. Further, according to the plaintiffs, the termination option constituted a bargained-for element of each plaintiff's contract with the defendant rather than a simple statement of then-existing regulatory policy. As support, plaintiffs cite to a statement by Representative M. Caldwell Butler in support of legislation favoring loanholders, that the owner's right to prepay at the option of the borrower is a "bargained for consideration and important part of a contract of borrowing. . . ." 126 Cong. Rec. 22650 (1980).

Plaintiffs further claim that defendant anticipatorily repudiated the termination options because the 1992 legislation is inconsistent with plaintiffs' termination options when they signed their loan agreements. The plaintiffs argue that the administrative pro-

---

1. Plaintiffs move for partial summary judgment only on Count One of their complaint. Plaintiffs also claim in Count Two of their complaint that they are entitled to just compensation for a Fifth Amendment taking of their properties in an amount which will be proven at trial. Plaintiffs further claim that they are continuing to suffer injury and resulting damages each day that they are denied the ability to exercise their contractual termination right and to market their properties at any time at their option.

cedures which implemented the 1992 legislation left no potential for restoring an owner's termination option. Further, plaintiffs claim that even loanholders who have not pursued administrative remedies to prepay have standing to pursue a breach of contract action. Plaintiffs argue that any requirement to pursue administrative remedies would force owners to seek authorization from the defendant, when their original contracts entitled them to act at their own option; subject owners to unavoidable delay and costly proceedings that can result only in a restricted termination option; and compel owners to risk losing their properties altogether. Plaintiffs conclude that this would be no remedy at all. Thus, plaintiffs claim that they are entitled to breach of contract damages "as of the time they accrue," regardless of whether plaintiffs sought administrative remedies first.

In plaintiffs' opposition to defendant's motion to dismiss certain plaintiffs, they assert that defendant's argument that pre-1979 FmHA owners should be treated differently from post-1979 owners is misguided. Plaintiffs claim that "the limitations period does not expire for *any* given plaintiff until six years after (i) defendant declared in the 1992 legislation that FmHA would be unable to accept the exercise of any termination option; *or* (ii) the date upon which plaintiff, but for defendant's repudiation, would have exercised its option—*whichever is later.*" (emphasis in original). Plaintiffs argue that the statute of limitations commenced to run at the earliest, at the enactment of the 1992 legislation, because the 1988 legislation was an interim and temporary measure. Second, plaintiffs claim that the limitations period cannot, in any event, commence to run until the defendant's originally scheduled performance date contending that no performance is required until a loanholder exercises the right to prepay.

In its Reply to Plaintiffs' Opposition to Defendant's Motion to Dismiss, defendant asserts that the statute of limitations commenced to run in 1988 because the pre-1979 plaintiffs' breach of contract claims accrued in 1988. According to the defendant, only the 1988 legislation affected pre-1979 loan-

holders' termination options because the 1992 legislation affected only post-1979 loanholders and did not mention pre-1979 loanholders' termination options at all. Second, the substantive terms of ELIHPA gave no indication that its provision affecting section 515 were temporary. Finally, defendant asserts that the breach is not wholly anticipatory because "some contractual nonperformance has occurred...." Consequently, defendant argues that the claim has accrued for the purposes of the statute of limitations.

First, defendant claims in response to Plaintiffs' Motion for Partial Summary Judgment that it should not be liable to plaintiffs as a result of future legislation affecting the section 515 program. Defendant claims that the "unmistakability doctrine" should apply because the defendant did not unmistakably grant to the plaintiffs the absolute right to prepay their mortgages regardless of future legislation or regulatory changes. Thus, defendant contends that pursuant to the unmistakability doctrine, enactment of ELIHPA and the 1992 legislation cannot subject the defendant to breach of contract damages, and plaintiffs' motion for partial summary judgment should be denied. Further, defendant claims that plaintiffs' contractually assumed the risk of future legislative changes.

Second, defendant claims that plaintiffs' breach of contract claims also must fail because enactment of ELIHPA and 1992 legislation constituted sovereign acts. Under the "sovereign acts doctrine," the defendant cannot be contractually liable for public acts taken in the sovereign capacity. Defendant argues that Congress enacted legislation amending the FmHA section 515 housing program in 1988 and 1992 to safeguard the housing opportunities of elderly and low-income individuals and families in rural areas. According to the defendant, in doing so, Congress was acting as sovereign in the interest of the public good, and, thus, cannot be contractually liable to plaintiffs for breach of contract.

In support of their motion for partial summary judgment, plaintiffs contend in their reply brief, that under ordinary principles of contract law, defendant has anticipatorily repudiated plaintiffs' contracts, thereby sub-

jecting itself to breach of contract damages. The plaintiffs agree with the defendant that the government, when entering into contracts, does not surrender its sovereign power unless it does so in unmistakable terms. Plaintiffs contend that they merely seek to enforce defendant's legal obligation to compensate them for repudiating defendant's contractual undertaking, which permitted plaintiffs to terminate their contracts at any time at their option. Further, plaintiffs assert that plaintiffs did not contractually assume the risk of future legislation, and also that the specific provisions of the contracts at issue and the circumstances surrounding them demonstrate that the parties intended the termination options to constitute binding contractual obligations. Plaintiffs further contend that the sovereign acts doctrine should not apply because the operative government act at issue here is directed specifically at defendant's contracts with plaintiffs and other similarly situated contractors. Plaintiffs also argue that when the court is confronted with government actions undertaken specifically to impede or frustrate the exercise of contractual rights, the sovereign acts doctrine stands as no barrier to plaintiffs' claim for the damages they have suffered as a consequence of defendant's repudiation.

## IV. DISCUSSION

### A. Defendant's Motion to Dismiss Certain Claims

When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction, pursuant to RCFC 12(b)(1), and/or a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4), has been articulated by the United States Supreme Court, as follows: "in

passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States*, 32 Fed.Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d 1178 (Fed.Cir.1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 746; *Alaska v. United States*, 32 Fed.Cl. at 695.

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States*, 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

In order for this court to have jurisdiction over the plaintiff's complaint, the Tucker Act, 28 U.S.C. § 1491 (1994), as amended 28 U.S.C.A. § 1491 (West Supp.1998), requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with

the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607, *reh'g denied*, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980) (*Mitchell I*); *United States v. Testan*, 424 U.S. 392, 398–99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Connolly*, 716 F.2d 882, 885 (Fed. Cir.1983) (*en banc*), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (citing *United States v. Sherwood*, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan*, 424 U.S. at 398, 96 S.Ct. 948. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States*, 17 Cl.Ct. 475, 479 (1989), *aff'd*, 904 F.2d 45 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*) (citing *United States v. Testan*, 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States*, 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied*, 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

■ Defendant moves to dismiss Count One, the breach of contract claim, included in the plaintiffs' complaint with respect to those plaintiffs who entered into loans before December 21, 1979. Defendant contends that, for the purpose of the statute of limitations calculations, the claims accrued on February 5, 1988, the enactment date of ELIHPA. According to the defendant, therefore, because the instant action was filed on October 31, 1996, more than six years after the date the claims accrued, the pre-1979 claims are barred by the statute of limitations. The present action is governed by the statute of limitations set forth in 28 U.S.C. § 2501 (1994). Generally, for statute of limitations purposes, a claim first accrues, "when all events have occurred which fix the liability of the Government and entitle the claimant to institute an action...." *Kinsey v. United States*, 852 F.2d 556, 557 (Fed.Cir.1988) (quoting *Oceanic Steamship Co. v. United States*, 165 Ct.Cl. 217, 225, 1964 WL 8621 (1964)).

It is the opinion of this court that the plaintiffs' breach of contract claims accrued on February 5, 1988, the enactment date of ELIHPA. The court agrees with the defendant that ELIHPA was the legislation that placed prepayment restrictions on plaintiffs who hold loans entered into before December 21, 1979.

■ In general, "a claim does not accrue until the claimant has suffered damages." *Terteling v. United States*, 167 Ct.Cl. 331, 338, 334 F.2d 250, 254 (1964); *accord Chipps v. United States*, 19 Cl.Ct. 201, 203 (1990), *aff'd*, 915 F.2d 1585 (Fed.Cir.1990) (Table). Although the limitations period begins to run when a claimant has suffered a compensable injury, that juncture is not to be confused with the point in time at which the claimant is finally able to calculate the precise quantum of damages. *Alaska v. United States*, 32 Fed.Cl. 689, 700 (1995); *see also Plaintiffs in Winstar–Related Cases v. United States*, 37 Fed.Cl. 174, 186 (1997), *aff'd, sub nom. Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874 (Fed.Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 67, 142 L.Ed.2d 53 (1998); *Jones v. United States*, 9 Cl.Ct. 292, 295 (1985), *aff'd*, 801 F.2d 1334 (Fed.Cir. 1986), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987).

Several recent cases in this court have addressed the same type of statute of limitations calculations as are at issue in the instant case. In *Anaheim Gardens v. United*

*States,* 33 Fed.Cl. 773 (1995), the court stated that:

> The court agrees with defendant that the prepayment restrictions which are the basis of plaintiffs' breach claim were imposed in 1988 as part of ELIHPA and were effectively reenacted in 1990 as part of LIHPRHA [Low–Income Housing Preservation and Resident Homeownership Act of 1990, 104 Stat. 4249]. The contracts upon which plaintiffs wish to sue were breached once, not twice. Although LIHPRHA contained several new provisions which had not been included in the earlier legislation, none of those provisions bears directly on plaintiffs' prepayment rights.

*Id.* at 776.

Additional language in the case states, "[t]he court believes, therefore, that the limitation period with respect to any of the properties in this case began as of the property's 20-year anniversary date or the date of the enactment of ELIHPA, whichever is later." *Id.* at 777.[2]

Nonetheless, also in the same case, the court wrote:

> ELIHPA's prepayment restrictions were effectively a partial repudiation by Congress of its contractual obligation to perform or, in other words, to allow plaintiffs to prepay their mortgages without HUD's consent after their 20–year anniversary date.... While plaintiffs might have brought suit immediately after the enactment of ELIHPA they should not be penalized for waiting, first, until after the enactment of Congress's "permanent solution" and then until after they would have been eligible for the benefit of the government's performance.

*Id.* at 778. Moreover, the *Anaheim Gardens* court further wrote, "[i]n the present case, it is doubtful that the enactment of ELIHPA in February 1988 was sufficient to satisfy the standard described in Hopland" [*Hopland*

*Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988) ]. *Id.* at 776.

However, in a later case, the *Anaheim Gardens* judge relied on the enactment date of ELIHPA, without qualification, as the date from which to calculate the statute of limitations, stating that: "[t]his court established in *Anaheim Gardens v. United States,* 33 Fed.Cl. 773 (1995), that breach of contract claims for the right to prepay HUD-endorsed mortgage balances accrues at the time of either enactment of ELIHPA or the property's twenty-year prepayment date, whichever is later." *Alder Terrace Inc. v. United States,* 39 Fed.Cl. 114, 120 (1997).

To further confuse the situation, in *Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174, another judge of this court described the *Anaheim Gardens* decision as follows: "[t]he court ruled that the plaintiffs' claims could not have accrued until the second statute's enactment.... The court also ruled that the claims could not have accrued until plaintiffs' prepayment rights were ripe—that is, until the 20-year period prescribed by the mortgages had expired." *Id.* at 188. The *Winstar–Related Cases* judge accepted the first legislation (ELIPHA) as a temporary solution, but nonetheless described the first statute as "an anticipatory repudiation because Congress could have withdrawn the moratorium when it enacted the permanent legislation [LIHPRHA]." *Id.*

■ The prior decision field is, therefore, less than clear. Although decisions of our predecessor court, the United States Court of Claims, are binding precedent on judges of this court, together with decisions of the United States Supreme Court and the United States Court of Appeals for the Federal Circuit, the decisions of the United States Court of Federal Claims, although persuasive and helpful, do not constitute binding precedent for decisions in the United States Court of Federal Claims. *See South Corp. v. United*

---

**2.** In *Anaheim Gardens,* the HUD loanholders' prepayment options did not vest until the properties' 20th anniversary. Thus, the court held that the statute of limitations accrued no earlier than the properties' 20th anniversary or the time at which the plaintiffs became eligible to prepay.

In the instant case, because the FmHA loanholders' prepayment options matured at the time of mortgage execution, the statute of limitations accrued as early as the date of enactment of legislation restricting the prepayment rights.

*States,* 690 F.2d 1368, 1371 (1982). Moreover, even if previous decisions on the statutes of limitations issue under consideration were clear, plaintiffs' reliance on *Anaheim Gardens* is misplaced. The finding in *Anaheim Gardens* pertains to the HUD provisions of ELIHPA, which differ from the FmHA provisions of ELIHPA at issue in the instant case. While subtitles B and D of the Act, including the HUD provisions at issue in *Anaheim Gardens,* were slated to expire on the two-year anniversary of ELIHPA's enactment, the FmHA provisions in subtitle C were not slated to expire at any time. Pub.L. No. 100–242, § 203, 101 Stat. 1877 (1988). As noted in the conference report on ELIHPA, "the Farmers Home Administration provisions are amendments to permanent law and are not subject to the sunset provisions in Subtitle A." H. Conf. Rep. No. 100–426, 100th Cong., 1st Sess. 199 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3458, 3496.

■ Plaintiffs also incorrectly claim that because the government's alleged breach constitutes anticipatory repudiation, their claims do not accrue until they choose to exercise their prepayment option. Although plaintiffs cite *Anaheim Gardens* as support, *Anaheim Gardens* actually undermines their contention. The plaintiffs in *Anaheim Gardens* were holders of HUD-insured mortgages who originally had the option of prepaying their mortgages at any time only after the 20-year period following the execution of their loans. *Id.* at 773. ELIHPA and subsequent statutes imposed certain restrictions upon this prepayment option, and plaintiffs in *Anaheim Gardens* filed suit. *Id.* Responding to a statute of limitations argument, the court held that plaintiffs' breach of contract claims accrued, as stated above, on the latter of the property's 20-year anniversary date or

the date of enactment of ELIHPA. *Anaheim Gardens* at 777.

Significantly, although the plaintiffs in *Anaheim Gardens v. United States* had been eligible to prepay at any time *following* the 20-year period, the court did not postpone accrual of the statute of limitations until the plaintiffs actually chose to exercise their prepayment rights. *Id.* Instead, the court held that accrual began as of the first date on which plaintiffs could have exercised their prepayment rights or the enactment date of ELIPHA, whichever is later. *Id.* In the above-captioned case, consistent with *Anaheim Gardens,* the plaintiffs' accrual of claim will not wait for the plaintiffs to exercise their right to prepay. Instead, the FmHA loanholders' claims accrued when Congress altered the prepayment option on February 5, 1988, the enactment date of ELIHPA.[3] *See Alaska v. United States,* 32 Fed.Cl. at 700 (the limitations period begins to run when a claimant has suffered a compensable injury).

This court's holding is also consistent with *Kinsey v. United States* which explained:

> An anticipatory repudiation occurs when an obligor communicates to an obligee that the obligor will commit a breach in the future.... In such a situation, the normal rule is that the statute of limitations begins to run from the date of performance specified in the contract unless the obligee elects to sue earlier for anticipatory breach.

*Kinsey v. United States,* 852 F.2d 556, 558 (Fed.Cir.1988). The plaintiffs incorrectly contend that the "performance" required was to accept prepayment if and when plaintiffs choose to exercise their rights to prepay. In

---

3. Plaintiffs in the above-captioned case alleged at oral argument against defendant's motion to dismiss that the plaintiffs in *Anaheim Gardens* signed affidavits that they would exercise their prepayment options as soon as they matured, *i.e.,* on the loan agreements' 20th year anniversaries. After a cursory search of the official record in *Anaheim Gardens* located at the court, these affidavits were not located. However, the record indicates that plaintiffs alleged in their complaints that they "anticipated that, after twenty (20) years, they would exercise their right to prepay their mortgage and thus realize accrued

appreciation, either through sale to purchasers at market value, or through rents from market-rate tenants." *Anaheim Gardens v. United States,* Second Amended Complaint, August 18, 1995, ¶ 26 at 18. The allegations in the complaint appear far less definitive than had they been offered in affidavits stating that the plaintiffs would have exercised their options at the end of 20 years. In *Anaheim Gardens,* however, the court did not rely on these facts when deciding that the statute of limitations began to run on the loan's 20th year anniversary, or the enactment of ELIHPA, whichever is later.

the instant cases, the "performance" required by the government was to allow plaintiffs to prepay at any time, thereby terminating the low-income affordability restrictions. Because the enactment of ELIHPA legally barred FmHA from allowing plaintiffs to prepay at any time, the statute of limitations began to run from that date.

In conclusion, plaintiffs' breach of contract claims accrued on February 5, 1988 when ELIHPA was enacted and restricted plaintiffs' right to prepay and terminate low-income restrictions at any time. Plaintiffs filed this action on October 31, 1996, more than six years after February 5, 1988. As a result, the statute of limitations bars plaintiffs' breach of contract claims relating to those loans which were entered into before December 21, 1979, and those claims are, hereby, dismissed.

An additional issue arose in the above-captioned case as to whether a pre-1979 loan that was modified or assumed post-1979 should be treated as a pre-1979 or post-1979 loan for purposes of the statute of limitations. If such loan can be treated as a pre-1979 loan, then the statute of limitations for these plaintiffs has expired and these claims should be dismissed. Plaintiffs claim that such loanholders should be treated as post-1979 loanholders because they claim that the defendant "cannot provide satisfactory assurance that [such plaintiffs] will be treated as holding pre-79 contracts for any purpose other than the statute of limitations issue now before the Court." Defendant, on the other hand, claims that the category of plaintiffs should be divided, and only some of the plaintiffs should be treated as holding post-1979 loans. Defendant argues that the category should be divided into those plaintiffs who assumed loans and those who merely modified their loans. According to the defendant, these two divisions should again be divided into plaintiffs whose assumption or modification agreements contain language that restrict their prepayment options, and those whose assumption or modification agreements do not contain such language.

First, this court holds that, between 1982 and 1987, only assumptions by eligible applicants on new terms should be subject to the restrictive prepayment provisions. An assumption agreement that contains restrictive prepayment language is merely suggestive, not dispositive, of whether the restrictive prepayment provisions apply. The lack of restrictive language in the assumption agreement is insufficient to demonstrate that pre-1979 prepayment provisions continue to apply. According to regulations in effect between 1982 and 1987:

> All of RRH [Rural Rental Housing], RCH [Rural Cooperative Housing], and LH [Farm Labor Housing] loans, including those approved prior to December 21, 1979 which are transferred to eligible applicants *on new terms* will become subject to the prepayment requirements of Section 502(c) of Title V, Housing Act of 1949, as amended. The appropriate restrictive language concerning prepayment ... must be inserted in the Form FmHA 460-5 and in the Loan Agreement or Resolution. For transfers on new terms the prepayment restriction period will begin on the date the transfer and assumption is closed.

7 C.F.R.1965.65(f)(6)(iii) (1985) (emphasis added). This regulation was originally promulgated on May 10, 1982, 47 Fed.Reg. 19962, 19970 (May 10, 1982) and remained in effect until June 30, 1987, 54 Fed.Reg. 24282, 24288 (June 30, 1987). Among other changes, the "on new terms" language was deleted from the regulations in 1987. Regulations in effect from 1982 to 1987 further explained that "[t]ransfers to eligible applicants will generally be completed on the basis of the same terms if the loan account is current or can be brought current when the transfer and assumption is closed," and "[t]ransfers to eligible applicants desiring to assume delinquent loans which cannot be brought current at the time of closing, and transfers to ineligible applicants, will be transferred on the basis of new terms." 7 C.F.R. § 1965.65(b)(1)(i),(ii) (1985).

Because the defendant movant has not demonstrated that any of these assumption contracts were assumed on the same terms, this court denies defendant's motion to dismiss these particular plaintiffs. Absent a factual analysis of the facts and circumstances surrounding the assumptions, defen-

dant cannot presume that these plaintiffs assumed the contracts on the same terms and subject to the pre-1979 prepayment provisions.

Second, consolidation of loans made between 1982 and 1987 similarly are not subject to the pre-1979 prepayment provisions and are not dismissed. Regulations regarding consolidations provide that loans must be "transferred under § 1965.65(f)(6) of this subpart on *new terms* to the transferee" before the appropriate officials can approve the consolidation. 7 C.F.R. § 1965.68 (1985) (emphasis in original). As discussed above, § 1965.65(f)(6) provides that loans transferred on new terms will be subject to the restrictive prepayment restrictions. Consequently, all approved consolidated loans between 1982 and 1987 became subject to the restrictive prepayment provisions. Since these loans are not subject to the pre-1979 prepayment provisions, they cannot be dismissed at this time.

Third, plaintiffs who modified their loans between 1982 and 1987 are subject to the pre-1979 prepayment provisions only if the modifications do not extend the due date of the loan. Section 1965.70, which regulates reamortizations of loans, provides that "[the restrictive prepayment provisions] will be applied in any reamortization which extends the final due date regardless of when the loan was originally approved." 7 C.F.R. § 1965.70(d)(8) (1985). The defendant has not provided enough detail about plaintiffs' reamortization agreements to conclude whether the final loan due date was extended. Defendant movant, thus, has not demonstrated that the pre-1979 prepayment provisions apply to these plaintiffs. The court cannot dismiss these plaintiffs at this time.

Finally, in contrast to assumptions and modifications of loans made between 1982 and 1987, which were sometimes made subject to pre-1979 prepayment provisions, assumptions and modifications of loans made after 1987 are not subject to pre-1979 prepayment provisions. In 1987, the regulations were modified to reflect the application of the post-1979 restrictive prepayment provisions to all transferees of assumed mortgages and loanholders of reamortized loans. With re-

spect to assumptions, the regulations were modified to provide:

> All RRH, RCH, and LH loans, including those approved prior to December 21, 1979, which are transferred to eligible applicants will become subject to the restrictive-use provisions of section 502(c) of title V, Housing Act of 1949, as amended. The restrictive-use language ... must be added, with the advice of OGC, to the assumption agreement, security instruments, and loan agreement/resolution.

7 C.F.R. § 1965.65(f)(8) (1998). With respect to reamortizations, the 1987 regulations were amended and provided that "the prepayment restrictive-use provisions of section 502(c) of title V, Housing Act of 1949, as amended will apply." 7 C.F.R. § 1965.70(d)(8) (1998). Based on these regulations, the court holds that plaintiffs whose loans were assumed or modified after 1987 are not subject to the pre-1979 prepayment provisions and should not be dismissed.

In conclusion, at this time, the court does not find it appropriate to dismiss any of the plaintiffs who assumed or modified loans between 1982 and 1987, unless that plaintiff can be found to have been treated as subject to the pre-1979 prepayment provisions. Defendant has not demonstrated that plaintiffs who assumed or modified loans between 1982 and 1987 are subject to the pre-1979 prepayment provisions. Consequently, the court denies defendant's motion to dismiss these plaintiffs. Furthermore, with respect to plaintiffs who assumed or modified loans after 1987, the regulations strongly support and this court holds that these plaintiffs are not subject to the pre-1979 prepayment provisions. Consequently, this court also denies defendant's motion to dismiss these plaintiffs.

### B. Plaintiffs' Motion for Partial Summary Judgment

Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the Court of Federal Claims (RCFC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar in language and ef-

fect.[4] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Stated otherwise, if the nonmoving party cannot present evidence to support its case under any scenario, then there should be no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs.*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs.*, 20 Cl.Ct. at 679.

---

4. In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Sec'y*

*DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

Pursuant to RCFC 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories, and admissions. *Id.*

Plaintiffs move for partial summary judgment on Count One of plaintiffs' complaint, contending that defendant's inability, by reason of legislative enactments beyond its absolute control, to perform its contractual undertaking makes the government liable to the plaintiff for breach of contract damages. Defendant raises two grounds in support of its position that ordinary contract principles should not apply. Defendant relies on the "sovereign acts doctrine," which dictates that " '[w]hatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons.' " *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925) (quoting *Jones v. United States,* 1 Ct.Cl. 383, 384, 1865 WL 1976 (1865)). Defendant also relies on the "unmistakability doctrine," which allows "the Government to make agreements that bind future Congresses, but only if those contracts contain an unmistakable promise." *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1578 (Fed.Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998).

For the reasons discussed more fully below, this court denies plaintiffs' motion for partial summary judgment on Count One of the complaint, the breach of contract claim. Although the government's sovereign acts defense is denied because ELIHPA and the 1992 legislation were not "public and general" acts, the government's unmistakability

defense applies to these facts. The court finds that the government did not promise in unmistakable terms that it would not exercise its sovereign authority to enact legislation that could frustrate the performance of the contracts at issue. Because the court grants the defendant's unmistakability defense in its motion to dismiss, plaintiffs' motion for partial summary judgment on its breach of contract claims is denied.

### 1. Sovereign Acts Doctrine

■ Defendant incorrectly claims under the sovereign acts doctrine that it should not be contractually liable for the effects of ELIHPA or the 1992 legislation because they constituted sovereign acts which were enacted in the interest of the public good. The sovereign acts doctrine was recognized by the United States Supreme Court in *Horowitz v. United States,* 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925). In that case, the Supreme Court reasoned:

It has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign. In the *Jones* case [*Jones v. United States,* 1 Ct. Cl. 383, 384, 1865 WL 1976 (1865)], the court said:

"The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons.... In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court.[5]

---

5. The concept of the need to treat the government in its role as a contractor the same as a private party can be found in *Deming v. United States,* 1 Ct.Cl. 190, 1865 WL 2004 (1865), in

which the court stated, "[t]he United States as a contractor are not responsible for the United States as a lawyer" and, therefore, that "[i]n this court the United States can be held to no greater

Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants."

*Id.* at 461, 45 S.Ct. 344 (citations omitted). *See also Jones v. United States,* 1 Ct.Cl. at 384.

■ The sovereign acts doctrine does not apply, however, when the government act at issue is specifically designed to avoid an existing contractual obligation. "The doctrine of 'public and general' 'sovereign acts' ... does not relieve the Government from liability where it has specially undertaken to perform the very act from which it later seeks to be excused." *Freedman v. United States,* 162 Ct.Cl. 390, 402, 320 F.2d 359, 366 (1963) (citations omitted). *See Cienega Gardens v. United States,* 33 Fed.Cl. 196, 211 (1995), *appeal docketed,* No. 97–5126, 97–5134 (Fed. Cir. Aug. 20, 1997); *see also Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786, 817 (1978). Applying the defense in such a situation would improperly grant the government carte blanche to avoid liability for any contractual commitment to its citizens merely by enacting legislation repudiating the commitment. Assuredly, no private party has that luxury. As noted in *Yankee Atomic Elec. Co.,* 112 F.3d at 1574–75, the sovereign acts doctrine attempts to balance the dual government roles of contractor and sovereign.

■ In *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), Justice Souter, writing for the plurality, addressed what he described as the twin roles "as a contractor and a sovereign." *Id.* at 892, 116 S.Ct. 2432. When the government enters into a contract, "its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Id.* at 895, 116 S.Ct. 2432 (quoting *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934)). The government-as-contractor cannot exercise the power of its twin, the government-as-sovereign, for the purpose of altering, modifying, obstructing or violating the particular

contracts into which it had entered with private parties. Such action would give the government powers that other private contracting parties lack. *See Yankee Atomic Elec. Co. v. United States,* 112 F.3d at 1574–75. On the other hand, as Justice Souter explained, the government-as-sovereign must remain free to exercise its powers. For this reason, the early United States Court of Claims cases "thought it 'grave error' to suppose that 'general enactments of Congress are to be construed as evasions of [the plaintiff's] particular contract.'" *United States v. Winstar Corp.,* 518 U.S. at 893, 116 S.Ct. 2432 (quoting *Deming v. United States,* 1 Ct.Cl. at 191). According to Justice Souter in the *Winstar* case:

> The sovereign acts doctrine thus balances the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor. If the answer is no, the Government's defense to liability depends on the answer to the further question, whether that act would otherwise release the Government from liability under ordinary principles of contract law.

*United States v. Winstar Corp.,* 518 U.S. at 896, 116 S.Ct. 2432. Thus, this court is instructed that it is not a hard and fast rule, but rather a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that specific legislation was designed to target prior governmental contracts.

In *Winstar,* Justice Souter suggests that the sovereign acts doctrine should apply if the act has the substantial effect of releasing the government from its own contractual obligations. *Id.* at 899, 116 S.Ct. 2432. In *Winstar* Justice Souter wrote that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, had the substantial effect of releasing the government from its own contractual obligations. *Id.* at 900, 902, 116 S.Ct. 2432. Based on legislative history, Justice Souter found that "Congress obviously expected FIRREA to have such an effect, and in the absence of any evidence to the

liability than other contractors in other courts." *Id.* at 191.

contrary we accept its factual judgment that this would be so." *Id.* at 902, 116 S.Ct. 2432. The plurality also concluded that although FIRREA did not formally target particular transactions, this does not make the act public and general. It reasoned that "legislation can almost always be written in a formally general way, and the want of an identified target is not much security when a measure's impact nonetheless falls substantially upon the government's contracting partners." *Id.* at 902–903, 116 S.Ct. 2432. Although the broad purpose of FIRREA was to advance the general welfare, this also does not make the act public and general. Justice Souter explained that the plurality "assume[d] nothing less of all congressional action, with the result that an intent to benefit the public can no more serve as a criterion of a 'public and general' sovereign act than its regulatory character can." *Id.* at 903, 116 S.Ct. 2432. Justice Souter concluded that while its "limited enquiry into the background and evolution of the thrift crisis leaves us with the understanding that Congress acted to protect the public in the FIRREA legislation, the extent to which this reform relieved the Government of its own contractual obligations precludes a finding that the statute is a 'public and general' act for purposes of the sovereign acts defense." *Id.*

Moreover, the United States Court of Appeals for the Federal Circuit en banc had reasoned in *Winstar & Glendale Federal Bank v. United States*, 64 F.3d 1531, 1550 (Fed.Cir.1995), that FIRREA was not a sovereign act because the statute specifically targeted thrifts. The Federal Circuit appears to have been convinced that the statute targeted thrifts for two reasons: 1) the statute plainly singled out supervisory goodwill for special treatment; and 2) the legislative history behind FIRREA demonstrated that those debating the bill in Congress knew that some thrifts claimed to have contractual rights regarding the use of supervisory goodwill and that the subject provisions would breach those contracts. *Id.* at 1549.

Based on the above, in the present case, the relevant statutory enactments in ELIHPA and the 1992 legislation [6] were not sovereign acts because 1) the statutes specifically targeted FmHA loanholders, and 2) the legislative history reflects Congress's concern with these FmHA contracts and their breach of the prepayment terms. The salient statutory restrictions on the prepayment option are as follows:

> The Secretary may not accept an offer to prepay, or request refinancing in accordance with subsection (b)(3) of this section of, any loan made or insured under section 1484 or 1485 of this title pursuant to a contract entered into after December 21, 1979, but before December 15, 1989, unless the Secretary takes appropriate action which will obligate the borrower (and successors in interest thereof) to utilize the assisted housing and related facilities for the purposes specified in section 1484 or 1485 of this title, as the case may be, for a period of—(i) fifteen years from the date on which the loan was made in the case of a loan made or insured pursuant to a contract entered into after December 21, 1979, but before December 15, 1989, and utilized for housing and related facilities which have not received assistance under section 1490a(a)(1)(B) or (a)(2) of this title or section 1437f of this title; or (ii) twenty years from the date on which the loan was made in the case of any other such loan. . . .

42 U.S.C. § 1472(c)(1)(A); and

> Before accepting any offer to prepay, or requesting refinancing in accordance with subsection (b)(3) of this section of, any loan made or insured under section 1484 or 1485 of this title pursuant to a contract entered into prior to December 15, 1989, the Secretary shall make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities involved for not less than

---

6. The provisions enacted in LIHPRHA are not at issue in the above-captioned case because, as is discussed earlier in the opinion, the FmHA provisions in subtitle C of ELIHPA were permanent upon enactment and did not contain a sunset provision.

the 20-year period beginning on the date on which the agreement is executed.

42 U.S.C. § 1472(c)(4)(A).

These relevant statutory restrictions in ELIHPA and the 1992 legislation specifically targeted the termination options found in FmHA's contracts with the loanholders. However, these statutory provisions affect only the pre-1979 loanholders because only these loanholders had prepayment option terms in their contracts.

Moreover, the legislative history of these measures verifies Congress' specific focus on such contracts. During the debate regarding the 1980 legislation that repealed the 1979 legislation's attempt to restrict the termination option, Representative Butler stated, "in legal terms this is called ... an impairment of the obligations of a contract. In layman terms it is called changing the rules in the middle of the game. In some circles it is called welching. Whatever it is, it is basically unfair." 126 Cong. Rec. 22650 (1980). Moreover, Senator Heflin stated in a debate regarding the 1988 legislation that, "[i]t is the obligation of the U.S. Government to fulfill contractual agreements into which it enters, or, at a minimum, to justly compensate those parties whose contractual rights it abrogates." 136 Cong. Rec. 26372 (1990).

The legislative history relevant to the case at bar clearly shows that Congress was concerned with contracts that contained prepayment option terms. Such evidence of intense concern with these contracts suffices to show that ELIHPA and the 1992 legislation had the substantial effect of releasing the government from its own contractual obligations. *See United States v. Winstar Corp.*, 518 U.S. at 902, 116 S.Ct. 2432. Accordingly, based on the legislative history, which reflects the legislation's substantial effect on FmHA loanholders, and evidence that the legislators were aware of such impacts, the sovereign acts doctrine is no barrier to plaintiffs' claim for the damages they claim to have suffered as a consequence of the government's repudiation.

The government incorrectly contends that the sovereign acts doctrine bars plaintiffs' claims merely because the government in enacting the legislation was acting in the public interest. Plaintiffs do not dispute that Congress when enacting ELIHPA and the 1992 legislation, the legislators were also acting in the interests of the public good. Plaintiffs, however, correctly contend that governmental action benefitting the public interest alone is insufficient to sustain the sovereign acts doctrine. As Justice Souter, writing for the plurality, observed in *Winstar*, "an intent to benefit the public can no more serve as a criterion of a 'public and general' sovereign act than its regulatory character can." *Id.* at 903, 116 S.Ct. 2432. *See also Cienega Gardens v. United States*, 33 Fed.Cl. at 211 ("[a]n act of the government does not qualify as a sovereign act merely because it was undertaken for the public good; the act must also be shown to be generally applicable to the public, contractors and non-contractors alike.").

In conclusion, the government incorrectly contends that the sovereign acts doctrine applies in the present case to ELIHPA and the 1992 legislation. First, the statutes substantially effect the FmHA loanholders' prepayment options. The statutes have minimal general impacts because they repudiate contracts with FmHA loanholders contracts that had prepayment option terms. Second, the legislative history behind the statutes reflects Congress' concern with such contracts and the repudiation of such prepayment terms. Thus, neither ELIHPA nor the 1992 legislation is a public and general act to which the sovereign acts defense applies.

### 2. The Unmistakability Doctrine

The defendant also argues in its motion for partial summary judgment that "the unmistakability doctrine" applies in the present case. At issue is whether the government, by contract with the loanholders, has surrendered the right to exercise its sovereign power "in terms which admit of no other reasonable interpretation." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (quoting *City of St. Louis v. United Rys. Co.*, 210 U.S. 266, 280, 28 S.Ct. 630, 52 L.Ed. 1054 (1908)).

■ The unmistakability doctrine invoked by the defendant was recently discussed in

detail by the United States Supreme Court in *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964. Justice Souter, writing for the plurality, summarized modern unmistakability doctrine precedent as follows:

> a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power.

*United States v. Winstar Corp.*, 518 U.S. at 878, 116 S.Ct. 2432. As described in *Yankee Atomic Elec. Co. v. United States*, 112 F.3d at 1578, the remaining justices in *Winstar* essentially agreed with this formulation by the plurality of the unmistakability doctrine, although they disagreed with its application to the facts of the case before them.

Plaintiffs contend that the unmistakability doctrine does not apply to the present case because the contracts at issue can be reasonably construed to include a risk-shifting component that may be enforced without effectively barring the exercise of sovereign power. Plaintiffs attempt to rely on Justice Souter's opinion in *United States v. Winstar Corp.*, 518 U.S. at 887, 116 S.Ct. 2432, which suggests that the unmistakability doctrine will not apply when, without implicating its sovereign powers, a contract agrees to shift the risk of loss onto the government, thereby requiring the government to indemnify a contracting partner against financial loss arising from a regulatory change. Although the justices in *Winstar* were divided as to whether or not the unmistakability doctrine was applicable to the facts of that case, Justice Souter, writing the plurality opinion, determined that the unmistakability doctrine was not applicable. *Winstar* involved the fallout from the crisis involving the savings and loan industry in the late 1970's and early 1980's. The government induced healthy thrifts to merge with ailing ones by agreeing to provide favorable regulatory treatment, allowing the healthy thrifts to contribute toward their capitalization requirements certain "supervisory goodwill" generated by the mergers. *Id.* at 848, 116 S.Ct. 2432. This initiative, however, did not resolve the thrift industry crisis. As a result, Congress enacted FIRREA, which required that thrift institutions no longer use "supervisory goodwill" to meet their capitalization requirements. This immediately caused several thrifts to fall out of compliance with capitalization requirements, thereby rendering the institutions subject to seizure by thrift regulators. The thrifts filed suit claiming breach of contract.

According to Justice Souter, the unmistakability doctrine applies when the government is subject either to a claim that its contract has surrendered a sovereign power, or to a claim that cannot be recognized without creating an exemption from the exercise of such power. *Id.* at 878, 116 S.Ct. 2432. The application of the doctrine thus turns on whether the enforcement of the contractual obligation would block the exercise of a sovereign power of the government or cannot be recognized without creating an exception from the exercise of full power. *Id.* at 878–79, 116 S.Ct. 2432. The plurality held that the doctrine was inapplicable in *Winstar* because the contracts with the thrifts did not preclude the government from later exercising its sovereign power. Instead, the contracts shifted the risk of loss onto the government, thereby requiring it to "indemnify its contracting partners against financial losses arising from regulatory change." *Id.* at 887, 116 S.Ct. 2432.

Five justices disagreed with the plurality's conclusion that the unmistakability doctrine was not available to the government in the *Winstar* case simply because the contracts were risk-shifting agreements. Justice Scalia, writing for himself and two concurring justices, opined, along with the Chief Justice's dissent, that the unmistakability doctrine applied. *Id.* at 920, 924, 116 S.Ct. 2432. The three concurring justices pointed out that Justice Souter's approach was inconsistent with precedent, which had "not made the availability of these sovereign defenses (as opposed to their validity on the merits) depend upon the nature of the contract at issue." *Id.* at 919, 116 S.Ct. 2432. Therefore, although for reasons different from

those of the plurality, Justice Scalia concluded that:

> It was found below that the Government had plainly made promises to regulate in a certain fashion, into the future; I agree with those findings, and I would conclude, for the reasons set forth above, that the promises were unmistakable.

*Id.* at 922, 116 S.Ct. 2432.

Writing for the two dissenting justices, Chief Justice Rehnquist characterized the plurality position as follows:

> The plurality tells us the unmistakability doctrine will apply where a plaintiff either seeks injunctive relief to hold the Government to its alleged surrender of sovereign authority (which generally means granting the plaintiff an exemption to the changed law), or seeks a damage award which would be "the equivalent of" such an injunction or exemption.

*Id.* at 926, 116 S.Ct. 2432. Chief Justice Rehnquist and Justice Ginsburg in their dissent concluded that the unmistakability doctrine applied in *Winstar* and that the contracts at issue did not contain an unmistakable promise against future regulatory change. *See also id.* at 924 and 930–31, 116 S.Ct. 2432.

Plaintiffs cite the United States Court of Federal Claims' decision in *Cienega Gardens v. United States,* 33 Fed.Cl. 196, 212 (1995), which held that the unmistakability doctrine provides no defense to a claim for breach of contract, citing the Federal Circuit's rejection of the unmistakability doctrine in *Hughes Communications Galaxy, Inc. v.*

*United States,* 998 F.2d 953 (Fed.Cir.1993), and *American Satellite Co. v. United States,* 998 F.2d 950 (Fed.Cir.1993). However, in light of the three concurring and two dissenting justices' opinions in *Winstar,* the effect of *Cienega, Hughes* and *American Satellite,* which preceded *Winstar,* is called into question. As discussed above, Justice Scalia, writing for the three concurring justices, and Chief Justice Rehnquist, writing for the two dissenting justices in *Winstar,* appeared to disagree with these opinions, concluding instead that the unmistakability doctrine applies even if the contract can be reasonably construed as a risk-shifting agreement and the enforcement of the agreement would not effectively bar the exercise of sovereign power. *United States v. Winstar Corp.,* 518 U.S. at 919, 926, 116 S.Ct. 2432.

Based on the reasoning of five of the justices participating in *Winstar* (evidenced in the concurring and dissenting opinions) who favored applying the unmistakability doctrine to that case, this court concludes that the unmistakability doctrine appears to still have life and, therefore, should be applied in the present case. Although this court, and, undoubtedly, many others would welcome further clarification, this conclusion appears to be consistent with the views of five of the justices who explained that the doctrine should be applied in the *Winstar* case.[7] This court, therefore, must address the merits of the issue, and given the facts of the case at bar decide whether the contracts between the FmHA loanholders and the government unmistakably precluded the government

---

**7.** The United States Court of Appeals for the Federal Circuit noted in *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1578–79 (Fed. Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998), a case decided subsequent to the issuance of the decision by the United States Supreme Court in *Winstar,* that:

> Five justices [in *Winstar*] disagreed with the plurality's conclusion that the unmistakability doctrine was not available simply because the contracts were risk-shifting agreements. The three concurring justices pointed out that the plurality's approach was inconsistent with precedent, which had "not made the availability of these sovereign defenses (as opposed to their validity on the merits) depend upon the nature of the contract at issue." Moreover, "[v]irtually every contract operates, not as a guarantee

of particular future conduct, but as an assumption of liability in the event of nonperformance." Despite this difference, these three justices concurred because they believed that the contracts contained unmistakable promises to continue the favorable regulatory treatment. The two dissenting justices concluded that the doctrine applied and that the contracts did not contain an unmistakable promise against future regulatory change.

> Based on the reasoning contained in the *Winstar* opinion, we conclude that the unmistakability doctrine applies in the present case. This conclusion respects the views of the five justices who stated that the application of the doctrine is unrelated to the nature of the underlying contracts.

from subsequently exercising its sovereign power.[8] This court concludes that no such promises existed in the contracts at issue in the above-captioned case. The prepayment terms in the FmHA contract do not constitute a promise by the government in unmistakable terms that it will not exercise its sovereign right to enact legislation to improve the section 515 program in order to promote the statutory purposes of the act, even if such legislation might frustrate future performance under the contract.

The United States Supreme Court has stated that "contractual arrangements, including those to which a sovereign itself is party, 'remain subject to subsequent legislation' by the sovereign." *Bowen v. Public Agencies Opposed to Social Sec. Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 147, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982)). In *Merrion,* the Supreme Court observed that, "sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." 455 U.S. at 148, 102 S.Ct. 894, *quoted in Bowen v. Public Agencies Opposed to Social Sec. Entrapment,* 477 U.S. at 52, 106 S.Ct. 2390. Thus, "contracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority." *Id.* at 52–53, 106 S.Ct. 2390.

In the present case, the parties agreed, as a term in the pre–1989 loan agreement, that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." In addition, however, the mortgage agreement states that, "[t]his note shall be subject to the present regulations of the [FmHA], and to its *future regulations* not inconsistent with the express provisions hereof." (emphasis added). The government cannot be said, via these two terms, to have unmistakably waived its sovereign right to modify its obligations through future acts of Congress. Plaintiffs contend that the government made a promise that its subsequent actions would not frustrate the prepayment terms of the contract, and argue that the obligation is contained implicitly within the prepayment term. However, as noted above, according to *Bowen,* such a surrender of sovereign power must be done in unmistakable terms. Implying a surrender of sovereign power from the contract's prepayment term cannot be termed unmistakable. Indeed, if the surrender of sovereign power were to be implied, such a promise would be no different than what applies to private parties, but more than this is required under the unmistakability doctrine. *See United States v. Winstar Corp.,* 518 U.S. at 935, 116 S.Ct. 2432 (Rehnquist, C.J., dissenting).

Based on the *Winstar* opinion, the applicability of the unmistakability doctrine to particular cases after *Winstar* is unclear. A majority of the justices on the United States Supreme Court appear to suggest in the plurality and dissenting opinions in *Winstar* that when the unmistakability doctrine is applicable, it imposes a high burden on the party asserting that the government has promised to immunize the contractor from subsequent changes in law.[9] Justice Souter, writing for the plurality, includes a discussion which appears to characterize the showing necessary for a finding that the government unmistakably waived its sovereign right (when the unmistakability doctrine is ap-

---

8. Note that in *Yankee Atomic Elec. Co. v. United States,* 112 F.3d at 1579, the United States Court of Appeals for the Federal Circuit proceeded in similar fashion:

> Having decided that the unmistakability doctrine applies, we next address the merits of the arguments on that issue. This requires us to decide whether the contracts between Yankee Atomic and the Government unmistakably precluded the Government from subsequently exercising its sovereign power to assess a tax. We conclude that no such promise existed in the contracts.

9. Counting Justices Souter, Stevens, and O'Connor in the plurality, and Chief Justice Rehnquist and Justice Ginsburg in the dissent. Justice Breyer joined the plurality, but is not counted with the plurality in this regard, due to language in his separate concurring opinion which discusses implied-in-fact promises and suggests that there is not an additional "clear-statement" rule which shields the government from liability. *Id.* at 914, 116 S.Ct. 2432.

plied), as a "second promise" not to exercise its authority to change a contractual term.[10] In this respect, Justice Souter appears to reject the argument made in Justice Scalia's concurrence that the unmistakability doctrine simply requires a clearly intelligible intent sufficient to rebut the presumption that governments do not normally agree to curtail their sovereign or legislative powers. As applied in *Winstar*, Justice Scalia's reasoning resulted in a conclusion that particular regulatory standards would be applied to the plaintiffs, with there being no necessity for an explicit "second promise" negating the application of subsequent legislation.[11] Chief Justice Rehnquist, for the dissent, also disagrees with Justice Scalia's finding that the government had made a promise that its subsequent action would not frustrate the contract when he wrote: "Justice Scalia ... finds that obligation is contained implicitly within the 'promis[e] to regulate ... in a particular fashion,' and the Government's consideration." *Id.* at 935, 116 S.Ct. 2432 (Rehnquist, C.J., dissenting). Specifically, Chief Justice Rehnquist concluded that the government's promise to regulate in a particular fashion does not constitute an unmistakable promise that its subsequent action would not frustrate the contract. *Id.* Thus, *Winstar* suggests that three justices in the plurality were struggling, although in dicta, with the concept endorsed by the two judges in the dissent—that a government's mere promise to regulate in a particular fashion does not constitute an unmistakable promise that its subsequent action would not frustrate the contract. In the present case, the government's prepayment option term does not constitute an unmistakable promise that its subsequent actions would not frustrate the contractual term.

The government did not surrender its sovereign right in its mortgage agreement because the term does not guarantee the prepayment option against future acts of Congress. The key language in the FmHA mortgage agreements makes contract terms subject only to "[FmHA's] future regulations not inconsistent with the express provisions hereof." No such commitment regarding possible statutory enactments appears in the language of the loan and mortgage documents, and future regulations of FmHA are not synonymous with future acts of Congress. Thus, it cannot reasonably be said that the government unmistakably surrendered its sovereign right to modify its obligations via statute. *See Parkridge Investors Ltd. Partnership by Mortimer v. Farmers Home Admin.,* 13 F.3d 1192, 1198 (8th Cir.1994), *cert. denied,* 511 U.S. 1142, 114 S.Ct. 2163, 128 L.Ed.2d 886 (1994) (an FmHA mortgage agreement that exempts the contract from future regulations inconsistent with its express provisions does not exempt the contract from future acts of Congress).

In conclusion, this court denies plaintiffs' motion for partial summary judgment for Count One of plaintiffs' complaint, their breach of contract claim. Although the court rejects the government's sovereign acts defense because ELIHPA and the 1992 legislation were not "public and general" acts, the court believes the government's unmistakability defense to be dispositive. For the foregoing reasons, the court holds that the unmistakability doctrine applies in the instant case. The court further holds that the government did not promise in unmistakable terms that it would not exercise its sovereign authority to enact legislation that would frustrate the performance of its contract. Be-

10. "We accordingly hold that the Federal Circuit correctly refused to apply the unmistakability doctrine here. There being no need for an unmistakably clear 'second promise' not to change the capital requirements, it is sufficient that the Government undertook an obligation that it subsequently found itself unable to perform." *United States v. Winstar Corp.,* 518 U.S. at 887, 116 S.Ct. 2432 (Souter, J., plurality) (citation omitted).

11. [The plaintiffs'] claim is that the Government quite plainly promised to regulate them in a

particular fashion, into the future. [The plaintiffs'] say that the very subject matter of these agreements, an essential part of the quid pro quo, was government regulation; unless the Government is bound as to that regulation, an aspect of the transactions that reasonably must be viewed as a sine qua non of their assent becomes illusory. I think they are correct.

*Id.* at 921, 116 S.Ct. 2432 (Scalia, J., concurring).

cause the court allows the defendant's unmistakability defense, the plaintiffs' motion for partial summary judgment is denied.

Although Justice Souter concluded that the unmistakability defense was not available in *Winstar*, the conclusion of this court in the above-captioned case that the government did not breach the contracts based on the unmistakability defense, appears to reflect the views of a majority of the members of the *Winstar* court. In the FmHA claims now before this court, the prepayment options included in varying terms in the plaintiffs' contracts have not been demonstrated by the plaintiffs before this court to be "essential to the contract between the parties." *United States v. Winstar*, 518 U.S. at 909, 116 S.Ct. 2432. Nor can it be said in the instant case that for the plaintiffs currently before this court, "[i]t would, indeed, have been madness ... to have engaged in these transactions with no more protection than the Government's reading would have given them, for the very existence of their institutions would then have been in jeopardy from the moment their agreements were signed." *Id.* at 910, 116 S.Ct. 2432. In the case at bar, although many of the loanholders might have considered prepayment options important to the contract, the contract had value even without the guaranteed prepayment option. Moreover, the value of the prepayment option was anticipatory and the loanholders continued to derive benefits as a result of the agreements they had signed even though unable to realize their preferred schedule.

### V. CONCLUSION

The court grants the defendant's motion to dismiss the breach of contract claims presented in the complaint by certain plaintiffs, due to the expiration of the statute of limitations and resulting lack of jurisdiction. The court holds that pre-1979 loanholder plaintiffs' breach of contract claims accrued on February 5, 1988 when ELIHPA was enacted and restricted those plaintiffs' right to prepay and terminate low-income restrictions at any time. Those plaintiffs filed this action on October 31, 1996, more than six years after February 5, 1988. As a result, the statute of limitations bars the breach of contract claims relating to loans entered into before December 21, 1979, and those claims are, hereby, dismissed.

This court also denies plaintiffs' motion for partial summary judgment as to the remaining plaintiffs on Count One of their complaint, as to their breach of contract claims. Although the court rejects the government's sovereign acts defense because ELIHPA and the 1992 legislation were not "public and general" acts, the court finds that the unmistakability defense raised by the defendant is applicable. The court further holds that the government did not promise in unmistakable terms that it would not exercise its sovereign authority to enact legislation that could frustrate the performance of its contract. Because the court grants the defendant's unmistakability defense, plaintiffs' motion for partial summary judgment is denied.

**IT IS SO ORDERED.**