**GRASS VALLEY TERRACE, a California Limited Partnership, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

No. 98–726 C.

United States Court of Federal Claims.

April 12, 2000.

Reissued for Publication: May 22, 2000.

Jeff H. Eckland, Minneapolis, MN, for plaintiff. William L. Roberts and Mark J. Blando, Minneapolis, MN, of counsel.

Mark L. Josephs, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant, with whom were David M. Cohen, Director, and David W. Ogden, Acting Assistant Attorney General.

## *OPINION*

DAMICH, Judge.

### I. Introduction

In this case, fourteen Plaintiffs, who entered into loan agreements with the Farmers Home Administration (FmHA), United States Department of Agriculture, to provide low-income rural housing, filed suit against the government alleging the government breached its contracts by enacting subsequent legislation that made it substantially more difficult for Plaintiffs to exercise their option to prepay their loans at any time. The Defendant filed a motion to dismiss on the ground that six of the Plaintiffs' claims are barred for lack of subject matter jurisdiction. Plaintiffs filed a motion for partial summary judgment as to their breach of contract claims (Count I). Plaintiffs claim as damages the value of the increased rents that Plaintiffs believe .they could have charged after prepayment, diminution in property value, and costs involved in continuing to comply with the FmHA housing program.

### II. Facts

Fourteen Plaintiffs entered into loans with the FmHA to provide rental housing for low- and moderate-income individuals and families in rural areas. These loans were made pursuant to §§ 515 and 521 of the Housing Act of 1949 (codified at 42 U.S.C. § 1485, 1490(a)). All the Plaintiffs entered into their contracts either before December 21, 1979 (pre–1979 contracts); or on or after December 21, 1979, but before December 15, 1989 (post–1979 contracts). The agreement to provide low-income housing consisted of a promissory note, a loan agreement, and a real estate mortgage.

In exchange for low-interest rates on their loans, Plaintiffs in the contracts agreed to numerous restrictions ("the investment return restrictions") on the use of their properties while their loans remained outstanding, including: (1) to accept only eligible low- or moderate-income persons as tenants; (2) to charge rents no higher than those permitted

by FmHA; (3) to restrict investment returns to a rate of 8% on their capital contributions; and (4) to maintain certain cash reserves.

FmHA included the following express provisions in the promissory notes executed by the borrowers in the Section 515 program: (1) "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower" and (2) "This Note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof" or "This Note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations and provisions hereof." For the pre–1979 Plaintiffs, the loan agreements, by their terms, including the investment return restrictions, continue only so long as the indebtedness under the promissory notes remains unsatisfied.

However, the contracts of Plaintiffs entering into loans with the FmHA on or after December 21, 1979 differed. Post–1979 Plaintiffs were required by the terms of the loan documents to maintain the low-income nature of the housing for a period of 15 or 20 years following the date of the loan.

### III. The Legislation

#### A. Emergency Low Income Housing Preservation Act of 1987 (ELIHPA)

On February 5, 1988, Congress amended the Housing Act by passing the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA). Pub.L. No. 100–242, 101 Stat. 1877 (1988), codified as amended at 42 U.S.C. § 1472(c) ("the 1988 legislation"). This legislation did not terminate the prepayment right of pre–1979 owners,[1] rather it placed a number of restrictions on the exercise of the prepayment option. For example, it required pre–1979 owners who made an offer to prepay, to negotiate an agreement with FmHA to extend the low-income use of their properties for a period of 20 years from the date of the agreement. 42 U.S.C. § 1472(c)(4)(A). In order to encourage owners to extend the low-income use of their properties, various incentives were offered

such as increases in the rate of return on investment, reductions on the interest rate on the mortgage loan, additional rental assistance and an equity loan. 42 U.S.C. § 1472(c)(4)(B). If borrowers chose not to extend the low-income use of their properties, borrowers were required to sell the housing to a qualified non-profit organization or public agency at a fair market value as determined by two independent appraisers. 42 U.S.C. § 1472(c)(5)(A).

In order to avoid placing its property for sale, the borrower was required to extend the low-income use of its property for a period of time determined by the Secretary but not less than 20 years from the date of the loan origination. 42 U.S.C. § 1472(c)(5)(G). However, owners were still required to offer to sell the property to qualified non-profits at the end of that period. *Id.* On the other hand, if the Secretary determined that housing opportunities for minorities would not be materially affected as a result of the prepayment and that either (a) tenants would not be displaced; or (b) that there is an adequate supply of affordable rental housing within the market area of the housing, then the prepayment restriction did not apply. *Id.*

#### B. Housing and Community Development Act of 1992

On October 28, 1992, Congress enacted the Housing and Community Development Act of 1992. Pub.L. No. 102–550 § 712, 106 Stat. 3681, 3841 (1992) (codified in relevant part at 42 U.S.C. § 1472(c)). This legislation amended the 1988 legislation by extending the application of the prepayment provisions to FmHA loans made on or after December 21, 1979, but prior to the date of enactment of the Department of Housing and Urban Development Reform Act of 1989. 42 U.S.C. § 1472(c)(4)(B)(vi). Furthermore, the legislation permitted the Secretary to provide incentives to extend the low income use by allowing owners to receive rent in excess of the amount normally permitted by loan recipients. *Id.*

---

1. The 1988 legislation did not address the post–1979 owners.

## IV. Procedural History

Plaintiffs commenced this action on September 16, 1998. In Count I, Plaintiffs allege that by enacting the Housing and Community Development Act of 1992, the government anticipatorily repudiated its contract with each of the Plaintiffs. Plaintiffs allege that the anticipatory repudiation constitutes a breach of contract as *of the date that each Plaintiff would terminate its contract* but for the government's repudiation. In Count II, Plaintiffs claim that Defendant's conduct constitutes a taking of Plaintiffs' properties for public use and requires payment to Plaintiffs of just compensation under the Fifth Amendment to the United States Constitution.

Also on September 16, 1998, Plaintiffs filed a motion for class certification pursuant to Rule 23 of the Rules of the United States Court of Federal Claims. The motion was denied on June 9, 1999.

On January 20, 1999, Defendant filed a motion to dismiss certain of Plaintiffs' claims. Specifically, Defendant seeks the dismissal of breach of contract claims of 6 Plaintiffs holding only "pre–1979" loans, and a portion of the breach of contract claim of one Plaintiff holding one pre–1979 loan.[2] On March 18, 1999, Plaintiffs responded by filing a motion for partial summary judgment with respect to their breach of contract claim (Count I of the complaint) and an opposition to Defendant's motion to dismiss. Oral argument was held.

## V. Discussion

### A. Motion to Dismiss Certain Claims

#### 1. Standard

Pursuant to Rule 12(b)(1) of the Court of Federal Claims, the Defendant moves to dismiss claims brought by six of the fourteen Plaintiffs for lack of subject matter jurisdiction because the claims violate the statute of limitations. The United States Court of Fed-

eral Claims is a court of limited jurisdiction. *Bath Iron Works Corp. v. United States,* 27 Fed.Cl. 114, 122, *aff'd,* 20 F.3d 1567 (Fed.Cir. 1994); *Dynalectron Corp. v. United States,* 4 Cl.Ct. 424, 428, *aff'd,* 758 F.2d 665 (Fed.Cir. 1984). The statute of limitations provides that "every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (1994). If. the motion to dismiss for lack of subject matter jurisdiction challenges the truth of the jurisdictional facts in the complaint, the court may look beyond the pleadings to consider all available evidence in order to determine jurisdiction. *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991). Because the statute of limitations is jurisdictional, "plaintiff bears the burden of proving that its action was timely filed." *McDonald v. United States,* 37 Fed.Cl. 110, 113 (1997).

#### 2. Arguments

Defendant argues that the Plaintiffs' breach of contract claims based upon loans executed on or before December 21, 1979, are barred by the statute of limitations. The claims first accrued upon the enactment of ELIHPA on February 5, 1988, and the present action was filed on September 16, 1998, more than six years later. The Defendant contends that ELIHPA immediately restricted the purported right of Plaintiffs to prepay their mortgages at any time. Therefore, if any breach occurred, it accrued in 1988.

In response, the Plaintiffs first argue that the limitations period does not commence to run upon enactment of the 1988 legislation because this legislation was only temporary. Plaintiffs claim the limitations period commences to run on the enactment of the 1992 legislation or the date on which Defendant, but for its repudiation, would have been required to *accept* the exercise of a termination option.

---

**2.** On November 10, 1999, the parties filed a joint stipulation with regard to two parties added to this action in July 1999, Baltimore, Ltd. & ABCD Trust. The parties stipulated that Defendant's motion to dismiss and Plaintiffs' motion for partial summary judgment apply to all Plaintiffs, including the two Plaintiffs added after Defendant filed the motion to dismiss. As to the additional Plaintiffs, the parties agree that Baltimore, Ltd., is a post–1979 Plaintiff. The parties disagree as to whether ABCD Trust is a "pre–1979" or "post–1979" Plaintiff.

In support, Plaintiffs rely on finding (10) in the "Finding and Purpose" section of the legislation. Pub.L. No. 100–242, § 202, 101 Stat. 1815, 1878 (1988). The pertinent finding states, "[U]ntil the Congress can act on recommendations that will emerge from this review, interim measures are needed to avoid the irreplaceable loss of low income housing and irrevocable displacement of current tenants." *Id.*

Plaintiffs argue that the language calling for "interim measures" indicates that the provisions relating to FmHA loan holders were only temporary measures thus failing to give notice to Plaintiffs that their so-called "unfettered right" to prepay at any time was permanently altered. Further, Plaintiffs argue that because Congress set the HUD provisions in the 1988 legislation to expire after two years, it was therefore reasonable for the FmHA loan holders to question whether Congress would change the law regarding the pre–1979 contract prepayment provision.

### 3. Analysis

■ A claim first accrues for purposes of the statute of limitations when all events have occurred which fix alleged liability of defendant and entitle plaintiff to institute action. *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir. 1988). A claim does not accrue unless the claimant knew or should have known that the claim existed. *Jones v. United States,* 801 F.2d 1334, 1335 (Fed.Cir.1986). Whether a plaintiff should have been aware of the existence of a claim is an objective test in which "a plaintiff does not have to possess actual knowledge of all relevant facts in order for the cause of action to accrue." *Fallini v. United States,* 56 F.3d 1378, 1380 (Fed.Cir. 1995) (citing *Menominee Tribe v. United States,* 726 F.2d 718, 721 (Fed.Cir.1984)).

■ Plaintiffs incorrectly claim that the 1988 legislation affecting FmHA loans was temporary rather than permanent. First, Plaintiffs place greater emphasis on the "Findings and Purpose" section than is appropriate. The "Findings and Purpose section" is similar to a policy section or preamble. "The policy section like the preamble is available for the clarification of ambiguous provisions of the statute, but may not be used to create ambiguity." 2A Sutherland Stat. Const. § 20.12 (5th Ed.1992 Rev.). "The declaration of policy like the preamble is not part of the substantive portion of the statute." *Id.* It is well settled that "unless explicitly provided to the contrary, statutes continue in force until abrogated by subsequent action of the legislature." *Id.* at § 34.01. "A statute may contain a provision prescribing that it will cease to operate on the happening of a specified event or date." *Id.* Without such a provision, the general rule is that a statute continues in effect indefinitely. *Id.*

■ The 1988 legislation contains a "sunset" provision in Section 203 which specifically states that two years after the date of enactment of the legislation subtitles B and D are repealed. Pub. Law No. 100–242, § 203, 101 Stat. 1878 (1988). The FmHA provisions at issue in the present case are contained in Subtitle C. There is no indication that the FmHA provisions contained in Subtitle C were temporary. On the contrary, the conference report on ELIHPA stated, "the Farmers Home Administration provisions are amendments to permanent law and are not subject to the sunset provisions in Subtitle A." H. Conf. Rep. No. 100–426, 100th Cong., 1st Sess. 199 (1987), reprinted in 1987 U.S.C.C.A.N. 3458, 3496. Thus, the legislation contains clear express language providing for the termination of HUD but not FmHA provisions. This Court cannot do what Plaintiffs ask, that is, to use the "Findings and Purpose" section to create ambiguity where none exists. If this Court were to adopt Plaintiffs' reasoning, it would be saying that all legislation is temporary because Congress can always change it. Instead, the law requires us to treat legislation as fully enforceable until it is later repealed by subsequent legislation. As a result, the 1988 enactment of ELIHPA, rather than any other legislation, immediately restricted the Plaintiffs' right to prepay their loans at any time at their option because it placed certain restrictions on prepayment.

Moreover, even though the Federal Circuit in *Alder Terrace* found that ELIHPA was a

temporary measure in dealing specifically with HUD loans, the court found that Plaintiff was on notice that the Emergency Act of 1988 and its 1988 interim implementing regulations negated its contractual prepayment right, effective in January 1989. *Alder Terrace v. United States,* 161 F.3d 1372, 1379 (Fed.Cir.1998). In *Alder Terrace,* the plaintiff alleged damages as a result of the failure to allow prepayment according to the contract. *Id.* at 1373. The court held that the plaintiff's claims accrued on its contractual 20–year prepayment date of January 5, 1989. *Id.* at 1379. The Federal Circuit stated, "The fact that the Emergency Act was expressly a temporary measure does not impact our analysis. On January 5, 1989, the Emergency Act was in force and, under the [plaintiff's] analysis, was preventing the [plaintiff] from exercising its prepayment right." *Id.* at 1377.

This reasoning is consistent with *Alder Terrace.* In the case at bar, the pre–1979 loan holders allege that the Defendant breached the contractual right to prepay their loans at *any time* at their option. Unlike the plaintiffs in *Alder Terrace,* the pre–1979 contract holders were not required to wait 20 years before they could exercise their option to prepay at any time. Therefore, in this case, immediately upon enactment of the 1988 legislation the pre–1979 loan holders were on notice that they could no longer prepay their loans at any time at their option. According to *Alder Terrace,* the fact that the provisions concerning FmHA were temporary rather than permanent is irrelevant to the analysis. It remains that the 1988 legislation was in force and prevented the pre–1979 loan holders from exercising their prepayment right. Therefore, the claims of the pre–1979 contract holders accrued upon enactment of ELIHPA in 1988, the event that occurred to fix the alleged liability of Defendant, thus enabling Plaintiffs to bring suit.

### 4. Anticipatory Repudiation

In the alternative, Plaintiffs argue that the 1992 legislation constituted an anticipatory repudiation. Plaintiffs contend that the limitations period as to the claim of any Plaintiff does not commence to run until the date on which Defendant, but for its repudiation, would have been required to *accept* the exercise of that Plaintiff's termination option. Thus, according to Plaintiffs, acceptance occurs on whatever date in the future Plaintiffs choose to prepay their mortgages.

An anticipatory repudiation occurs when an obligor communicates to an obligee that the obligor will commit a breach in the future. *Kinsey v. United States,* 852 F.2d 556, 558 (Fed.Cir.1988). The aggrieved party is entitled to sue either when the anticipatory repudiation occurs or at the later time for performance under the contract. Calvin W. Corman, Limitation of Actions § 7.2.1 (1991). Generally, the statute of limitations begins to run from the date of performance specified in the contract unless the obligee elects to sue earlier for anticipatory breach. *Kinsey,* 852 F.2d at 558. However, if the breach is "not wholly anticipatory because it involves some contractual nonperformance, the statute of limitations begins to run immediately." *Id.*

This Court finds Plaintiffs' anticipatory repudiation theory unpersuasive. Plaintiffs incorrectly claim that the Defendant, according to the promissory note, is required to *accept* prepayment from the pre–1979 Plaintiffs. The contract language at issue *allows* the pre–1979 Plaintiffs to prepay their loans at any time at their option. The prepayment provision in the promissory note states, "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." A close examination of the language indicates that the performance required of the Government was to *allow* the pre–1979 Plaintiffs the option to prepay at any time. Therefore, the enactment of ELIHPA constituted an actual breach rather than an anticipatory repudiation because it immediately altered the right of the pre–1979 loan holders to prepay at any time at their option. The specific contractual nonperformance that occurred was the inability of FmHA, as a result of the 1988 legislation, to allow Plaintiffs to prepay at any time. Thus, Plaintiffs' claim is based on an alleged breach rather than the theory of anticipatory repudiation. The enactment of ELIHPA in

1988 was the event that occurred to fix the alleged liability of Defendant which triggered the statute of limitations. Plaintiffs were on notice that their unqualified right to prepay their loans at any time was breached, if at all, in 1988.

The pre–1979 Plaintiffs are not barred from prepaying their loans. They may still prepay subject to various restrictions imposed by the 1988 legislation. The contractual right that Plaintiffs' claim was breached was the so-called "unfettered right" to prepay their loans at any time at their option.

This reasoning is consistent with other decisions of this court. In *Adams v. United States*, the court stated:

> [T]he performance required by the government was to *allow* plaintiffs to prepay at any time, thereby terminating the low-income affordability restrictions. Because the enactment of ELIHPA legally barred FmHA from *allowing* plaintiffs to prepay at any time, the statute of limitations began to run from that date [the enactment of ELIHPA].

*Adams v. United States*, 42 Fed.Cl. 463, 474 (1998). In *Franconia Assocs. v. United States*, the court stated, "The government's performance, if it can be called that, is to keep its promise to allow borrowers an unfettered prepayment right. No further performance was required by the government under the terms of the prepayment clause." *Franconia Assoc. v. United States*, 43 Fed. Cl. 702, 710 (1999).

This reasoning is also consistent with the court in the context of HUD-insured housing programs. In *Anaheim Gardens v. United States*, the court held that the plaintiff's breach of contract claims accrued at either the enactment of ELIHPA or the 20–year anniversary date of the loan, whichever date was later. *Anaheim Gardens v. United States*, 33 Fed.Cl. 773, 777 (1995).[3] In *Anaheim Gardens*, the court did not wait until plaintiffs exercised their option to prepay and the Government had to accept prepayment to begin the statute of limitations. Rather, the court focused on the nature of the contractual right. In *Anaheim Gardens*, they could not prepay without permission until the 20–year anniversary of each of their loans. *Id.* The statute of limitations in *Anaheim Gardens* began to run when plaintiffs were no longer allowed to exercise their option pursuant to their contract. *Id.* This principle applies with equal force to the Plaintiffs in this case. Since the Plaintiffs' right to prepay already existed when ELIHPA was enacted, the legislation breached this right at the time of enactment.

Plaintiffs also rely on the "stabilization doctrine" in takings law to support their contention that Plaintiffs should not be penalized for waiting to sue until the 1992 legislation. In *Dickinson*, plaintiff brought a takings claim under the Tucker Act for flooding caused by the Government's construction of a river dam. *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947). The court allowed the party to delay filing the lawsuit until it was determined whether the taking of plaintiff's property by flooding was temporary or permanent. *Id.* at 750, 67 S.Ct. 1382.[4]

The "stabilization doctrine" in takings law has no application to the statute of limitations in this case. The Federal Circuit in *Ariadne Financial Services Pty., Ltd. v. United States* rejected the application of the doctrine outside of the context of a taking. *Ariadne*, 133 F.3d 874, 879 (Fed.Cir.1998). The court stated: "the Dickinson stabilization principle, however, does not apply outside its context. Later cases have essentially confined the stabilization doctrine to the class of flooding cases from which it originated."

---

3. The plaintiffs were permitted to prepay their mortgages with HUD's permission during the first 20 years of the loan. *Anaheim Gardens*, 33 Fed.Cl. at 774. However, after 20 years, the property owners could prepay without HUD's permission. *Id.* ELIPHA and a subsequent statute imposed certain restrictions upon this prepayment provision. *Id.*

4. In *Dickinson*, the Supreme Court stated, "All that we are here holding is that when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really taken." *Dickinson*, 331 U.S. at 749, 67 S.Ct. 1382.

*Id.; See, e.g., United States v. Dow,* 357 U.S. 17, 27, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958) ("The expressly limited holding in *Dickinson* was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated to public use.") Nonetheless, even if the Court were to apply the doctrine, the claim in this case is not a "continuing process of physical events." *Dickinson,* 331 U.S. at 749, 67 S.Ct. 1382. Rather, the passage of the 1988 legislation constitutes a single event that prevented Plaintiffs from exercising their right to prepay at any time.

Therefore, because the breach of contract claims of Plaintiffs holding loans entered into before December 21, 1979, accrued on February 5, 1988, and this action was filed on September 16, 1998, these Plaintiffs' contract claims are barred by the statute of limitations and are dismissed.

### B. Plaintiffs' Motion for Partial Summary Judgment

#### 1. Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS,* 998 F.2d 979 (Fed.Cir. 1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must resolve any doubts about factual issues in favor of the non-moving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1307 (Fed.Cir.1998) and draw all reasonable inferences in its favor. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.,* 60 F.3d 770, 773 (Fed.Cir.1995).

#### 2. Arguments

Plaintiffs move for partial summary judgment on Count I, the breach of contract claim. This motion concerns Plaintiffs holding post–1979 contracts. Plaintiffs argue that Defendant anticipatorily repudiated the termination option in contracts entered between Plaintiffs and Defendant by enacting legislation that restricted any owner's future exercise of the termination option. Plaintiff maintains that ELIHPA, the 1992 legislation and the administrative procedures it established are inconsistent with Plaintiffs' termination option for three reasons. First, the legislation does not permit owners to exercise their right at their own option because owners are required to seek Defendant's authorization before any termination option can be exercised. Second, the procedures do not permit owners to exercise any termination option at the time of their own choosing. Third, the procedures place those owners who want to exercise their termination option without any restriction in a position of being compelled to participate in a "forced-sale proceeding" and risk losing their properties entirely.

Plaintiffs also contend that the termination option constitutes a bargained-for element of each Plaintiff's contract with Defendant and not merely a non-binding statement of regulatory policy as it existed when the contract was executed. Plaintiffs maintain that Defendant's inability to perform its contractual obligation that it would not subject Plaintiffs to future inconsistent regulations, makes it liable for breach of contract damages.

In opposition, Defendant raises the unmistakability doctrine. The Defendant argues that even if the prepayment provisions of ELIHPA and the 1992 legislation are inconsistent with the prepayment term so as to otherwise constitute a breach, the unmistakability doctrine bars Plaintiffs' contract claims. Defendant contends that under the contract terms at issue, the FmHA did not unmistakably promise not to subject the loan documents to future legislation.

In contrast, Plaintiffs argue that the applicability of the unmistakability doctrine is dependent upon whether the sovereign acts defense is available. Here, Plaintiffs state

that they seek only to enforce Defendant's legal obligation to pay damages for repudiating its contractual obligation to permit Plaintiffs to exercise their termination option. Therefore, because Plaintiffs do not seek to block the sovereign from exercising its powers to enact legislation, the unmistakability doctrine is inapplicable.

In this case, the Defendant does not raise the sovereign acts doctrine as a defense. However, in response to Plaintiffs' argument, the Defendant contends that the applicability of the unmistakability doctrine does not depend upon the applicability of the sovereign acts doctrine. Defendant argues that the unavailability of one in a given case does not automatically preclude the application of the other. The determination of whether a statute is a public and general act is unrelated to the determination of whether a contract contains language that unmistakably exempts a party from the effects of legislation.

There are no genuine issues of material fact in dispute. Thus, the Court must decide as a matter of law whether the Defendant breached Plaintiffs' contracts by enacting subsequent legislation that altered Plaintiffs' prepayment right.

### 3. The Unmistakability Doctrine

■ The first issue is whether the unmistakability doctrine is applicable to the contracts in this case. *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1578 (Fed.Cir.1997). Under this doctrine, which is a canon of contract construction, a governmental surrender of sovereign authority must be expressed in unmistakable terms in the contract. *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). "Contractual arrangements, including those to which a sovereign itself is party, 'remain subject to subsequent legislation' by the sovereign." *Id.* (quoting *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 147, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982)). Thus, "a contract with a sovereign government will not be read to include an unstated term

exempting the other contracting party from the application of a subsequent sovereign act (including an act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power." *United States v. Winstar Corp.,* 518 U.S. 839, 878, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). "The underlying presumption is that contracts with the government will be subject to later contrary legislation unless there is a clear promise otherwise in the contract itself." *Franconia Assoc. v. United States,* 43 Fed.Cl. 702, 713 (1999).

■ Recently, the Supreme Court in *Winstar* engaged in an extensive discussion of the unmistakability doctrine. In *Winstar,* the Supreme Court held that the United States was liable for breach of contract arising out of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). *Winstar,* 518 U.S. at 839, 116 S.Ct. 2432. The Supreme Court found that three savings and loans institutions had entered into contracts with the Government whereby they agreed to acquire failing thrifts in return for favorable accounting treatment. *Id.* at 848, 116 S.Ct. 2432. The favorable accounting treatment allowed the savings and loans institutions to count "supervisory goodwill" towards their capitalization requirements. *Id.* at 850–51, 116 S.Ct. 2432. However, the enactment of FIRREA barred this accounting practice and, as a result, federal regulators seized and liquidated two of the three banks. *Id.* at 858, 116 S.Ct. 2432. The Supreme Court found the Government liable for breach of contract. *Id.* at 910, 116 S.Ct. 2432.

Since the decision in *Winstar,* courts have struggled with its meaning. The *Winstar* decision was a plurality opinion; seven justices agreed on the issue of Government liability but their reasoning differed, including whether the unmistakability doctrine was applicable to the contracts in the case.[5] In this case, Plaintiffs rely on Justice Souter's reasoning in *Winstar* that the application of the unmistakability doctrine turned on whether enforcement of the contractual obligation al-

---

**5.** For an informative discussion of the various opinions in *Winstar* see *Adams v. United States,*

42 Fed.Cl. 463, 481–83 (1998).

leged would block the exercise of a sovereign power of the government. *Winstar,* 518 U.S. at 879, 116 S.Ct. 2432. Specifically, Plaintiffs rely on the following in Justice Souter's plurality opinion:

> So long as such a contract is reasonably construed to include a risk-shifting component that may be enforced without effectively barring the exercise of that power, the enforcement of the risk allocation raises nothing for the unmistakability doctrine to guard against, and there is no reason to apply it.

*Id.* at 880, 116 S.Ct. 2432.

Here, Plaintiffs allege that the contract includes a risk-shifting component; that is, FmHA accepted the risk that future legislative changes requiring it to subject owners to inconsistent regulatory measures would force it to indemnify owners for losses stemming from its nonperformance. Thus, Plaintiffs allege that the unmistakability doctrine should not apply.

However, a majority of the justices in *Winstar* found that the unmistakability doctrine applied to all government contracts, regardless of the nature of the contract or remedy sought.[6] The Federal Circuit in *Yankee Atomic* adopted the view of the five justices in *Winstar* regarding the applicability of the unmistakability doctrine. *Yankee Atomic,* 112 F.3d at 1579. There, the Federal Circuit reasoned that the unmistakability doctrine applied in the case because "this conclusion respects the view of the five justices who stated that the application of the doctrine is unrelated to the nature of the underlying contracts." *Id.* Thus, the Court follows the Federal Circuit's reasoning that the unmistakability doctrine should be applied to all government contracts.

Although the statement from the Federal Circuit in *Yankee Atomic* resolves this issue, it should be noted that other judges from the Court of Federal Claims reached the same result. In *Franconia Assoc.,* the court found the "controlling holding on the doctrine" as expressed by the majority of the Supreme Court to be that the unmistakability doctrine "must be used in interpreting all government contracts." *Franconia Assoc.,* 43 Fed.Cl. at 714. In *Adams,* the court also found the unmistakability doctrine applicable, stating that the doctrine "applies even if the contract can be reasonably construed as a risk-shifting agreement and the enforcement of the agreement would not effectively bar the exercise of a sovereign power." *Adams,* 42 Fed.Cl. at 482–83.

Since this case involves a government contract and Plaintiffs have alleged that an act of Congress breached the contract, the Court finds that the unmistakability doctrine should be applied. The next issue is whether the Government made an unmistakable promise not to subject Plaintiffs' prepayment option to contrary legislation.

### 4. Application of the Unmistakability Doctrine

■ Plaintiffs argue that if the unmistakability doctrine applies, this Court should find that an unmistakable promise was made not to subject the prepayment option to future inconsistent regulations.

What constitutes an unmistakable promise? In *Winstar,* the concurrence found that the contract at issue included an unmistakable promise to regulate the savings and loans in a particular manner in the future. *Winstar,* 518 U.S. at 922, 116 S.Ct. 2432. As pointed out by the court in *Franconia,* the concurrence explained that the "contract itself" was an unmistakable promise and to say otherwise would have rendered the contract illusory. *Franconia,* 43 Fed.Cl. at 715 (citing *Winstar,* 518 U.S. at 921, 116 S.Ct. 2432 (Scalia, J., concurring)). Justice Scalia went further to state, "Indeed, it is hard to imag-

---

6. The concurrence and the dissent comprised the majority of justices who found the unmistakability doctrine applicable to all government contracts. *Winstar,*. 518 U.S. 839, 116 S.Ct. 2432. The concurrence consisted of Justices Scalia, Kennedy and Thomas. *Id.* The dissent included Chief Justice Rehnquist and Justice Ginsburg. *Id.* The plurality opinion, joined by four justices, found that the unmistakability doctrine was inapplicable because they read the contracts as containing provisions essentially shifting the risk of legislation to the Government. *Id.* at 880–81, 116 S.Ct. 2432. However, the five justices comprising the concurrence and dissent believed that the plurality had misapplied precedent. *Id.* at 919, 116 S.Ct. 2432.

ine what additional assurance that the course of regulation would not change could have been demanded other than, perhaps, the Government's promise to keep its promise. That is not what the doctrine of unmistakability requires." *Winstar*, 518 U.S. at 922, 116 S.Ct. 2432.

Here, Plaintiffs attempt to draw an analogy between the prepayment term in the contracts in this case to the promise to afford favorable accounting treatment to Plaintiffs' in *Winstar*. This analogy falls short. In *Winstar*, the court found the accounting treatment to be granted supervisory goodwill and capital credits the subject of the express agreements between the regulators and the acquiring financial institutions. *Id.* at 853–55, 116 S.Ct. 2432. It was the purpose of the agreements. It is logical to conclude that the financial institutions would not have contracted with the government to acquire the failing thrifts without this favorable accounting treatment. When the Federal Circuit ruled on *Winstar*, they stated "if supervisory good will had not been available for purposes of meeting regulatory capital requirements, the merged thrift would have been subject to regulatory noncompliance and penalties from the moment of its creation." *Winstar v. United States*, 64 F.3d 1531, 1542 (Fed.Cir. 1995). Moreover, the terms and conditions of the agreement were reached through extensive negotiations between regulators and the financial institutions. *Id.* at 1536. This is evidenced by the numerous documents which comprise the "Agreement" of the parties. *Id.* at 1541.

In the case at bar, borrowers lacked bargaining power over the prepayment provision contained in the promissory notes. Here, borrowers entered into contracts with the FmHA for the purpose of providing low-income housing to eligible persons in return for low-interest loans at rates unavailable in the market. Here, unlike the special accounting procedures in *Winstar*, the prepayment provision was prescribed by regulation. While the prepayment provision in the contracts is an important provision, it is not the "quid pro quo" or the purpose of the contracts as was the promise to afford favorable accounting treatment in *Winstar*.

Contrary to Plaintiffs' beliefs, the prepayment provision contained in the standard form promissory note is not the essence of the agreement. Here, striking the prepayment provision from the promissory note leaves a viable contract. In contrast, striking the favorable accounting treatment from the *Winstar* contracts, the essence of the agreement is destroyed—nothing is left. Thus, under this analysis no unmistakable promise can be found.

In the case at bar, the provisions that Plaintiffs claim unmistakably promise to insulate the prepayment provision from subsequent acts of Congress read as follows: "This note shall be subject to the present regulations of the Farmers Home Administration and to its future *regulations* not inconsistent with the express provisions hereof." Additionally, Defendant points out that promissory notes executed by at least two Plaintiffs, Grass Valley Terrace and The Highlands, reads: "This Note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations and provisions hereof." Def. Reply Brief, n. 16, at 24.

In examining the plain language of these provisions, it cannot be concluded that the Government surrendered its sovereign power to enact subsequent legislation. In the first provision, the language at issue prevents the Farmers Home Administration from enacting future inconsistent *regulations*. However, we cannot expand this language to include changes in *legislation*. *See Parkridge Investors v. Farmers Home Admin.*, 13 F.3d 1192, 1198 (finding that future regulations are not synonymous with future acts of Congress). The unmistakability doctrine specifically precludes a reading of any unstated terms. One can not infer that "future *regulations*" meant to include subsequent *legislation*.

Moreover, the latter prepayment provision clearly indicates that Plaintiffs assumed the risk of future regulatory and legislative changes.

Recently, the Court of Federal Claims applied the unmistakability doctrine in *Franconia* and *Adams*. *Franconia*, 43 Fed.Cl. 702; *Adams*, 42 Fed.Cl. 463. In both of these cases the court found identical language not

to constitute an unmistakable promise that future legislation would not affect the prepayment terms of Plaintiffs' promissory notes. In *Franconia*, the court stated:

[T]hat it is likely that some property owners might not have entered into the agreements had the prepayment terms been less generous—it was not the reason for the agreement. By definition, a prepayment provision is not going to be the purpose of a loan.

*Franconia*, 43 Fed.Cl. at 715.

In *Adams*, the court stated:

Implying a surrender of sovereign power from the contract's prepayment term cannot be termed unmistakable. Indeed, if the surrender of sovereign power were to be implied, such a promise would be no different than what applies to private parties, but more than this is required under the unmistakability doctrine.

*Adams*, 42 Fed.Cl. at 483.

Because the Court finds that the Government did not promise in unmistakable terms that it would not exercise its sovereign power to enact subsequent legislation to carry out the purpose of the FmHA loans, Plaintiffs' motion for partial summary judgment as to Count I of Plaintiffs' complaint is DENIED.

## VI.   Conclusion

Pursuant to RCFC 54(b), inasmuch as there appears to be no just reason for delay, it is hereby ORDERED that Defendant's motion to dismiss the claims of pre–1979 contract holders because the claims violate the statute of limitations is GRANTED. The Clerk is directed to dismiss all Plaintiffs holding pre–1979 contracts.[7] It is further ORDERED that Plaintiffs' motion for partial summary judgment is DENIED. The parties shall contact the Court within 2 weeks of the date of this opinion to schedule a status

conference to discuss the remainder of the case.

---

**7.**   The Clerk is ORDERED to dismiss the breach of contract claims of the following Plaintiffs: (1) Majorie W. Kassner, (2) Eileen Kothe, (3) Peters, Williams & Kubota, a general partnership, (4) Pine Needles Apartments Limited Partnership, (5) Richard and Beatrice Schmidtbauer, (6) The