GRASS VALLEY TERRACE, A
California Limited Partnership,
et al., Plaintiffs,

v.

THE UNITED STATES, Defendant.

No. 98–726C.

United States Court of Federal Claims.

Jan. 2, 2002.

Jeff H. Eckland, Minneapolis, MN, for plaintiff. William L. Roberts and Mark J. Blando, Minneapolis, MN, of counsel.

Mark L. Josephs, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant, with whom were David M. Cohen, Director, Robert D. McCallum, Assistant Attorney General.

## OPINION

DAMICH, Judge.

Presently before the Court is Defendant's motion for summary judgment. Defendant seeks the dismissal of Plaintiffs' post–1979 contract claims because the Court previously held that Plaintiffs' contracts at issue do not contain an unmistakable promise by the Government to immunize Plaintiffs from subsequent legislation. *Grass Valley Terrace v. United States,* 46 Fed.Cl. 629, 640 (2000) ("*Grass Valley I* "). Additionally, the Defendant seeks dismissal of all Plaintiffs' takings claims, i.e. both pre–1979 takings claims and post–1979 takings claims. In opposition, Plaintiffs argue that the unmistakability doctrine does not apply to contracts where, as here, the subsequent legislation in question is not a sovereign act. This Court agrees with Defendant that the pre–1979 takings claims should be dismissed, but not the post–1979 takings claims. However, while leaving undisturbed its previous holding that the contracts at issue do not contain unmistakable promises, the Court accepts Plaintiffs' argu-

ment that the subsequent legislation at issue are not sovereign acts with respect to the contracts at issue, and also that the unmistakability doctrine does not bar Plaintiffs' contract claims in this case. Therefore, the Court GRANTS, in part, and DENIES, in part, Defendant's motion for summary judgment.

## I. Procedural Background

Plaintiffs filed this action on September 16, 1998. In Count I, Plaintiffs allege that the enactment of the Housing and Community Development Act of 1992, Pub.L. No. 102–550 § 712, 106 Stat. 3672, 3841 (1992) (codified in relevant part at 42 U.S.C. § 1472(c)) ("HCDA"), anticipatorily repudiated its contracts with each of the Plaintiffs. Plaintiffs allege that the anticipatory repudiation constitutes a breach of contract as *of the date that each Plaintiff would terminate its contract* but for the government's repudiation. In Count II, Plaintiffs claim that Defendant's conduct constitutes an "as applied" taking of Plaintiffs' properties for public use and requires payment to Plaintiffs of just compensation under the Fifth Amendment to the United States Constitution.

Previously, the Court dismissed the contract claims of pre–1979 owners because the claims violated the statute of limitations. *See Grass Valley*, 46 Fed.Cl. at 636. Additionally, the Court denied Plaintiffs' motion for partial summary judgment as to breach of the remaining contract claims, i.e. post–1979 contract claims because the unmistakability doctrine immunized the government from breach. *Id.* at 640.

## II. Factual Background

In this case, Plaintiffs entered into at least one loan agreement with the Farmers Home Administration (FmHA), United States Department of Agriculture, under Section 515 of the Housing Act of 1949 (codified at 42 U.S.C. § 1485). Section 515 authorized the FmHA to enter into contracts with private owners to make or insure loans for the purpose of developing housing for low-and mod-

erate-income and elderly tenants in rural areas. The loans are documented by, at a minimum, a loan agreement, promissory note and a mortgage or deed of trust. Other documents comprising the contracts could include assumption agreements and amendments to the original loan agreements. The term of the loans was generally 40 to 50 years.

In exchange for a loan, an owner agreed to abide by certain regulatory covenants. These covenants, contained in the loan agreements, covered such things as the rate of return on the investment, maintenance of financial records, use of the housing, and transfer of the property. For instance, owners were restricted to a maximum of 8% of their initial investment in the property, i.e. the down payment. Because the investment return limitations, set forth in the Loan Agreement executed by each owner, remained in effect only while an owner's indebtedness under the Promissory Note remained unsatisfied, an owner, by exercising its prepayment right, could terminate its obligations to abide by those limitations. According to Plaintiffs, the owner could then increase its investment return either by selling the property or by raising its rents to market levels.

Owners were also required, "[s]o long as the loan obligations remain[ed] unsatisfied, ... [to] comply with all appropriate FmHA regulations ..." Def.'s Mot. at App. 7. The agreement also provided that, "... any loan made or insured will be administered subject to the limitations of the authorizing act of Congress and related regulations ..." Def.'s Mot. at App. 61. Loan agreements executed after December 21, 1979, and mortgages executed relating to such agreements, also required the Plaintiffs to maintain the low-income nature of the housing for a minimum of 20 years from the date of their loans unless the Government determined that there was no longer a need for such housing or that Federal or other financial assistance provided to the residents of such housing would no longer be provided.[1]

---

1. The borrower and any successors in interest agree to use the housing for the purpose of housing people eligible for occupancy as provided in Section 515 of Title V of the Housing Act of 1949 and FmHA regulations then extant during this 20 year period beginning [date of execution

The promissory notes contain the provision that Plaintiffs contend has been breached by legislation: "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." Def.'s Mot. at App. 23. The promissory notes also required Borrowers to certify that they were unable to obtain loans elsewhere for similar purposes and periods of time, and they required the Government's consent for any sale, transfer, lease, assignment or encumbrance. Lastly, the notes included: "This Note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof." Def. Mot. at App. 30. This language was later changed to read: "This Note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations and provisions hereof." Def.'s Mot. at App. 61

Plaintiffs' contract and takings claims are based on two statutes. These statutes are: (1) the Emergency Low Income Housing Preservation Act of 1987, Pub.L. No. 100–242, 101 Stat. 1877 (1988), codified as amended at 42 U.S.C. § 1472(c); and (2) the Housing and Community Development Act of 1992.

## III. The Legislation

█ The Emergency Low Income Housing Preservation Act of 1987, ("ELIPHA") imposed restrictions on the pre–1979 owners right to pre-pay. The HCDA imposed those same restrictions on the post–1979 owners and added some other provisions.

### A. Emergency Low Income Housing Preservation Act of 1987 ("ELIPHA")

On February 5, 1988, Congress amended the Housing Act by passing the Emergency Low Income Housing Preservation Act of 1987 (ELIHPA). Although this legislation did not terminate the prepayment right of pre–1979 owners, it placed a number of restrictions on the exercise of the prepayment option. For example, it required pre–1979 owners who made an offer to prepay to negotiate an agreement with FmHA to extend the low-income use of their properties for a period of 20 years from the date of the agreement. 42 U.S.C. § 1472(c)(4)(A). In order to encourage owners to extend the low-income use of their properties, various incentives were offered such as increases in the rate of return on investment, reductions on the interest rate on the mortgage loan, additional rental assistance and an equity loan. 42 U.S.C. § 1472(c)(4)(B). If borrowers chose not to extend the low-income use of their properties, borrowers were required to sell the housing to a qualified non-profit organization or public agency at a fair market value as determined by two independent appraisers. 42 U.S.C. § 1472(c)(5)(A). If no qualified nonprofit organization or public agency made a bona fide offer to purchase the property within 180 days after the property was placed on sale then the Secretary had the discretion to accept prepayment from owners. *Id.*

In order to avoid placing its property for sale, the owner was required to extend the low-income use of its property for a period of time determined by the Secretary but not less than 20 years from the date of the loan origination. 42 U.S.C. § 1472(c)(5)(G)(i). However, owners were still required to offer to sell the property to qualified non-profits at the end of that period. *Id.* On the other hand, if the Secretary determined that housing opportunities for minorities would not be materially affected as a result of the prepayment and that either (a) tenants would not be displaced; or (b) that there is an adequate supply of affordable rental housing within the market area of the housing, then the prepayment restriction did not apply. 42 U.S.C. § 1472(c)(G)(ii)(I)-(II).

---

of loan]. No person occupying the housing shall be required to vacate prior to the close of such 20 year period because of early repayment. The borrower will be released during such period from these obligations only when the Government determines that there is no longer a need for such housing or that Federal or other financial assistance provided to the residents of such housing will no longer be provided. A tenant may seek enforcement of this provision as well as the Government.
Def.'s Mot. at App. 20.

**B. Housing and Community Development Act of 1992 ("HCDA")**

On October 28, 1992, Congress enacted the Housing and Community Development Act of 1992. This legislation amended ELIPHA by extending the application of the prepayment provisions to FmHA loans made on or after December 21, 1979, but prior to the date of enactment of the Department of Housing and Urban Development Reform Act of 1989. 42 U.S.C. § 1472(c)(4)(B)(vi). Furthermore, the legislation permitted the Secretary to provide a further incentive to extend the low income use by allowing owners to receive rent in excess of the amount normally permitted by loan recipients in order to defray the cost of long-term repairs or maintenance. *Id.* However, no incentives could be provided to post–1979 owners until the restrictive use period in the particular contract expired. 42 U.S.C. § 1472(c)(5)(C).

**IV. Pre–1979 Takings Claims Are Barred By the Statute of Limitations**

In light of the Federal Circuit's decision in *Franconia Assoc. v. United States*, 240 F.3d 1358 (Fed.Cir.2001), *petition for cert. filed*, 80 U.S.L.W. 3193 (U.S. Sept. 10, 2001) (No. 01–455), Plaintiffs' pre–1979 takings are dismissed because the claims accrued more than 6 years before the filing of the complaint.

In the Court of Federal Claims' decision in *Franconia*, Judge Gibson took up the issue sua sponte of whether Plaintiffs' pre–1979 takings claims were barred by the statute of limitations. Judge Gibson concluded that the pre–1979 takings claims accrued at the time of ELIHPA when Congress changed Plaintiffs' unfettered prepayment rights. The Federal Circuit agreed stating:

> The appellants' unfettered right to prepay their FmHA loans at any time was eliminated by the government with the passage of ELIPHA because ELIPHA prohibited FmHA from allowing unrestricted prepayments. The statute thus took away and conclusively abolished a material contract right. Because appellants brought this suit in May of 1997, more than six years

after ELIPHA effected an appropriation of their contract right, their takings claims are barred by the statute of limitations. *Franconia*, 240 F.3d at 1365–66.

**V. Post—1979 Contracts**

**A. *Grass Valley I*—The Court's previous decision**

In *Grass Valley I*, the Court denied Plaintiffs' motion for partial summary judgment on Count I, the breach of contract claim. The Court rejected Plaintiffs' argument that Defendant anticipatorily repudiated its prepayment option by enacting legislation that restricted an owner's future exercise of its prepayment option. The basis of that decision was that the unmistakability doctrine applied to the contracts and immunized the government from breach because there was no unmistakable promise to insulate the prepayment provision from subsequent legislation.

In its motion for summary judgment, Defendant argues, in light of the Court's earlier opinion, Plaintiffs cannot maintain a breach of contract claim because no unmistakable promise existed to insulate the prepayment provision from subsequent legislation. As a result, according to Defendant, the contract claims fail as a matter of law.

In opposition, Plaintiffs make two general arguments: (1) the Court erred in applying the unmistakability doctrine to the contracts at issue; and (2) genuine issues of material fact exist with respect to the criticality of the prepayment provision in the contracts.[2] These will be discussed in turn.

**B. Whether the Unmistakability Doctrine Applies To the Contracts**

**1. Rule 54(b)**

Plaintiffs ask the Court to reconsider its previous ruling concerning the unmistakability doctrine.[3] Rule 54(b) of the Rules of the Court of Federal Claims provides in pertinent part that "any order or other form of decision ... which adjudicates fewer than all the claims or the rights and liabilities of

---

2. See Rule 56(g) Affidavit in Support of Ps' Opposition to Summary Judgment.

3. Of course, Defendant opposes any modification of the Court's previous decision.

fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Because the Court's previous decision was not final as to the post–1979 contract claims, the Court may reconsider its earlier ruling.

2. The Relationship between the Sovereign Acts Doctrine and the Unmistakability Doctrine

The dispute between the parties centers on whether the Court can consider the unmistakability doctrine in isolation from the sovereign acts doctrine. In *Grass Valley I* the Court did not consider the sovereign acts doctrine, because the Defendant only argued the unmistakability doctrine, and the Court believed that the doctrines could be applied independently. *Grass Valley*, 46 Fed.Cl. at 637–38. In this case also, Defendant raises the unmistakability doctrine and not the sovereign acts doctrine, while Plaintiffs argue that they must be considered together. Specifically, Defendant argues that, since the Court denied Plaintiffs' motion for summary judgment because the government did not make an unmistakable promise not to change the terms of the contract by legislation, it should grant Defendant's motion for the same reason. While the Court was deliberating on Defendant's motion, Senior Judge Lydon issued his opinion in *General Dynamics v. United States*, 47 Fed.Cl. 514 (2000), and the Court asked the parties to address in supplemental briefing the impact of Judge Lydon's reasoning on this case. August 31, 2001 Order at 2.

*General Dynamics* contains an extensive discussion of the relation between the sovereign acts doctrine and unmistakability. Essentially, Senior Judge Lydon concluded that a court should first determine whether the legislation was a sovereign act. *General Dynamics*, 47 Fed.Cl. at 541 (following *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569 (Fed.Cir.1997)). If not, then the facts must be analyzed to determine whether the government is bound according to ordinary principles of contract law. *Id.* But if a court concludes that the legislation was a sovereign act, then it must determine whether the government made an unmistakable promise to be bound in contract despite subsequent legislative change. *Id.* This Court is persuaded by Senior Judge Lydon's reasoning. Therefore, the Court reconsiders its opinion in *Grass Valley I* insofar as that opinion holds that the sovereign acts doctrine and the unmistakability doctrine should be considered separately. However, the Court maintains its holding in *Grass Valley I* (if unmistakability is to be considered) that "the Government did not promise in unmistakable terms that it would not exercise its sovereign power to enact subsequent legislation to carry out the purpose of the FmHA loans." *Grass Valley*, 46 Fed.Cl. at 640.

C. The HCDA and the ELIHPA Were Not Sovereign Acts.

Following the method of analysis in *General Dynamics*, then, the first question to be determined is whether the legislation restricting the prepayment option was a sovereign act. Judge Horn in *Adams v. United States*, 42 Fed.Cl. 463 (1998), held that the same legislation that is involved in this case was not a sovereign act, *id.* at 479, although she also held that the government did not make an unmistakable promise to be bound in contract despite subsequent legislative change. *Id.* at 483. Judge Horn did not discuss the relation between the two doctrines, and *Adams* was issued before *General Dynamics*. *Adams*, therefore, applied the two doctrines independently, as did this Court in *Grass Valley I*.

*Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569 (Fed.Cir.1997), is still the most recent substantive Federal Circuit opinion on the sovereign acts doctrine, since the U.S. Supreme Court's *Winstar* decision. *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The purpose of that doctrine according to *Yankee Atomic* is to "balance the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor" *Yankee Atomic*,

112 F.3d at 1575, (quoting *Winstar,* 518 U.S. at 896, 116 S.Ct. 2432). In applying this balancing test, the Federal Circuit goes on to state that: "[I]t is not a hard and fast rule, but rather a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior government contracts." In examining the scope of legislation, the Federal Circuit reminds: "When construing an act of Congress, and especially when determining the essential characteristics of a particular statute, we must observe and understand the statute as a whole." *Yankee Atomic,* 112 F.3d at 1576.

*Yankee Atomic* concerned legislation that imposed a special annual uranium enrichment facility decommissioning assessment charged against utilities for their prior utilization of enriched uranium, produced by the government, as nuclear fuel to generate electricity. In holding that the legislation was not "designed to target prior government contracts," the Federal Circuit focused on the fact that the legislation applied to utilities that used and benefitted from the government's enrichment services whether or not they had prior contracts with the government. Thus the court concluded that the legislation "constitute[d] a general exercise of Congress's taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services." *Id.* at 1577.

As has been stated, Judge Horn in *Adams* held that the same legislation that is involved in this case was not a sovereign act. *Adams,* 42 Fed.Cl. at 479. Judge Horn's analysis draws on both the Federal Circuit's opinion and the Supreme Court's plurality opinion in the *Winstar* case.[4] *Adams,* 42 Fed.Cl. at 478–79 (citing *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), and *Winstar Corp. &*

Glendale Federal Bank, FSB v. United States, 64 F.3d 1531 (Fed.Cir.1995)). *Adams* makes the following points: (1) the sovereign acts doctrine does not relieve the government of its contractual obligations when the act at issue is "designed to avoid an existing contractual obligation," *id.* at 478, or has "the substantial effect of releasing the government from its own contractual obligations," *id.;* (2) although the act at issue may not formally target particular transactions, the government is still not relieved of its contractual obligations if "a measure's impact nonetheless falls substantially upon the government's contracting partners," *id.* at 479 (quoting *Winstar* 518 U.S. at 902–03, 116 S.Ct. 2432); and (3) the mere fact that the government acted to advance the public welfare, does not make the act "public and general," so that the government is relieved of its contractual obligations. *Id.* *Adams* further notes that the Federal Circuit's *Winstar* decision held that the legislation in question (FIRREA) specifically targeted thrifts for two reasons: (1) the statute singled out supervisory goodwill for special treatment, and (2) the legislative history demonstrated that Congress knew of the claim of contractual rights and that the legislation would breach them. *Id.*

In the case at bar, it is clear that Congress acted to advance the public welfare and that it did not formally target particular transactions (i.e., particular contracts), but, as *Adams* indicates, this is not enough to make the act "public and general." The impact of ELIHPA and the HCDA legislation fell substantially on the government's contracting partners. It is common knowledge that a prepayment option is an important aspect of a loan agreement.[5] The Federal Circuit has held that the same prepayment option that is at issue here is a material contractual term. *Franconia Assocs.,* 240 F.3d at 1366. Ac-

---

**4.** The plurality opinion of Justice Souter was joined in by Justices Stevens, Breyer, and O'Connor, but Justice O'Connor did not join in all of that part of the opinion in which sovereign acts was discussed.

**5.** In the context of home ownership, see Alan L. Feld & Stephen G. Marks, *Legal Differences Without Economic Distinctions: Points, Penalties and*

*the Market for Mortgages,* 77 B.U. L.Rev. 405, 405 (1997) (stating that for two general reasons, the homeowner may later wish to prepay a loan: (1) if interest rates decline, the homeowner who has borrowed at a fixed rate may seek to borrow at the lower rate and prepay the existing mortgage loan; (2) the homeowner may need liquidity and may seek to sell the home).

cording to the terms of the agreement, without the inclusion of a prepayment term in the contract, the owner is locked into an "8% maximum annual return on initial investment permitted under the loan agreement," which is characterized by Plaintiff as an "horrendous long term investment." Pl.'s Opp'n at App. 12 (Greenwalt Dec. ¶ 13).[6] Additionally, the House of Representatives Banking, Finance and Urban Affairs Committee observed how valuable the prepayment option was when stating that "the exhaustion of many tax benefits available to section 515 participants was 'driving owners to prepay or to refinance their FmHA loans,'" Def.'s Mot. at 7 (quoting H. Rep. No. 100–122(I), 100th Cong., 1st Sess. 53 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3317, 3369), indicating by its exercise that the prepayment option was an important aspect of the section 515 loan agreement.[7] The effect of the legislation in this case was to severely restrict the availability of the prepayment option. Furthermore, so restricting the prepayment option has the substantial effect of releasing the government from its own contractual obligations.

*Adams,* following both the Supreme Court's and the Federal Circuit's *Winstar* decisions, inquired into the legislative history to determine whether the legislation was "designed to avoid an existing contractual obligation" and whether Congress knew of the claim of contractual rights and that the legislation would breach them. Judge Horn noted that during the debate on the 1980 legislation that repealed the 1979 legislation's

attempt to restrict the termination option, Congressman Butler stated: "[I]n legal terms this is called … an impairment of the obligations of contract. In layman terms it is called welching. Whatever it is, it is basically unfair." *Adams,* 42 Fed.Cl. at 480, (quoting 126 Cong. Rec. 22650 (1980)). In the debate on the 1988 legislation, Judge Horn noted that Senator Heflin stated: "It is the obligation of the U.S. Government to fulfill contractual agreements into which it enters, or, at a minimum, to justly compensate those parties whose contractual rights it abrogates." *Id.* at 480, (quoting 136 Cong. Rec. 26372 (1990)). Congress noted that FmHA "believe[d] that it must honor requests to prepay or refinance [section 515] loans even though the result could be that much needed housing would be lost to the rural low and moderate income housing inventory." H.R.Rep. No. 96–154, 96th Cong., 1st Sess. at 43 (1979), U.S.Code Cong. & Admin.News, 1979, 2317 at 2359 (cited in Def.'s Mot. at 5). Congress amended Section 515 specifically in response to FmHA decision to honor these requests. *Id.* Finally, this Court agrees with *Adams* that the statutes here specifically targeted the FmHA loanholders as is clear from the salient statutory restrictions in the legislation.[8]

The circumstances of this case resemble more closely the circumstances of *Winstar* than *Yankee Atomic.* As has been mentioned, the legislation in *Yankee Atomic* applied to utilities that used and benefitted from the government's uranium enrichment services whether or not they had prior con-

---

**6.** Defendant does not dispute the financial impact of the elimination of the prepayment provision, though it does point out that the Plaintiff is still in a position to profit from the investment, if only at the maximum 8% annual return on investment. Def's Mot. at 20–21.

**7.** Defendant notes that Plaintiffs are not *absolutely* barred from using their land; that it is possible for Plaintiffs to prepay the mortgage—at the Secretary's option and only after qualified nonprofit organizations and public agencies have a 180 day opportunity to purchase the property at market value; and that even if Plaintiffs cannot prepay without extending the use restrictions, the properties would still produce rental income.

**8.** "The Secretary may not accept an offer to prepay, … any loan made or insured under section 1484 or 1485 of this title *pursuant to a*

*contract* entered into after December 21, 1979, but before December 15, 1989, unless the Secretary takes appropriate action which will obligate the borrower (and successors in interest thereof) to utilize the assisted housing and related facilities for the purposes specified in section 1484 or 1485 of this title, as the case may be, for a period of [years]." 42 U.S.C. § 1472(c)(1)(A) (quoted in *Adams* at 479) (emphasis added); and "[b]efore accepting any offer to prepay, … the Secretary shall make reasonable efforts to enter into an agreement *with the borrower* under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities…." 42 U.S.C. § 1472(c)(4)(A) (quoted in *Adams* at 479–80) (emphasis added).

 

tracts with the government.[9] In the case at bar, the prepayment option provisions of ELIHPA and the HCDA apply only to contractors with the government, as in *Winstar*, where the impact of FIRREA fell only on thrifts that had contracts with the government. In *Yankee Atomic*, the contracts had been fully performed by all parties. *Yankee Atomic*, 112 F.3d at 1573, n. 2. In this case, the Plaintiffs still seek to prepay without restriction. This was also true in *Winstar*, where the thrifts expected the government to continue to allow supervisory goodwill to count toward their regulatory capital requirements.

For the above reasons, the Court holds that HCDA and ELIHPA were not sovereign acts for purposes of Plaintiffs' post–1979 breach of contract claims. Since they are not sovereign acts, the Court, following the reasoning in *General Dynamics*, need not proceed to unmistakability analysis.

██ Nevertheless, it is not clear from the briefings whether the contracts were actually breached. Some contracts have not reached the 20–year limit, while other contracts have passed the 20–year limit, yet no attempt to pre-pay was made. Further, with respect to those FmHA contracts that were assumed, whether the allegedly breaching provisions of the ELIHPA and the HCDA were incorporated into at least some of those contracts. Therefore, the Court will not, at this point, enter judgment as to breach with respect to any contract at issue. Because the remaining post–1979 contract claims are yet to be resolved, all post–1979 takings claims are stayed pending the Court's resolution of all outstanding contract claims.

## VI. Conclusion

The Defendant's Motion for Summary Judgment is GRANTED in part, and DENIED in part. All pre 1979 takings claims

are dismissed. This Court ORDERS the parties to file, within 14 days of entry of this opinion, a joint status report with respect to further proceedings in this case, including 3 mutually agreeable dates for a status conference.

---

9. In *Yankee Atomic*, the Federal Circuit noted that the Energy Policy Act of 1992 required contributions from any utility that benefitted from the DOE's uranium enrichment services, regardless of whether the utility had a contract with the DOE or if the utility purchased the services through a secondary market. *Yankee Atomic*, 112 F.3d at 1575. Further, the Court noted that utilities that had contracted with the DOE for

enrichment services, but had in turn re-sold the services to another utility were not charged under the Act. In addition, according to the Court, the Act did not "make clear that its purpose was ... to abrogate past public contracts," *Id.* at 1577. From the above the Court reasoned that the "legislation was passed for the benefit of the public." *Id.* at 1575. *See* Pl.'s Opp'n at 19.